(No. 69191.—

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. IRVING RAMEY, Appellant.

*Opinion filed September 24, 1992.—Rehearing denied November 30, 1992.*

500

504

508

HEIPLE, J., joined by MILLER, C.J., concurring in part and dissenting in part.

Charles M. Schiedel, Deputy Defender, and Timothy M. Gabrielsen, Assistant Defender, of the Office of the State Appellate Defender, of Springfield, for appellant.

Roland Burris, Attorney General, of Springfield, and Jack O'Malley, State's Attorney, of Chicago (Terence M. Madsen, Assistant Attorney General, of Chicago, and Renee Goldfarb, Kevin Sweeney and James S. Veldman, Assistant State's Attorneys, of counsel), for the People.

JUSTICE MORAN delivered the opinion of the court:

The defendant, Irving Ramey, was indicted along with Joe Gant by a Cook County grand jury for, *inter alia*, the murder of Derrick Quincy Wilkinson. Defendant was tried separately and a jury found him guilty of murder-

ing Wilkinson and of committing the following additional offenses: home invasion, aggravated unlawful restraint, and possession of a stolen motor vehicle. He was sentenced to death on the murder charge; to 60 years for home invasion, to 6 years for aggravated unlawful restraint, and to 7 years for possession of a stolen motor vehicle. The death sentence was stayed (134 Ill. 2d R. 609(a)), pending direct review by this court (Ill. Const. 1970, art. VI, §4(b); 134 Ill. 2d R. 603).

Defendant raises the following pretrial issues: (1) whether he was denied equal protection of the laws when the State exercised its peremptory challenges against African-American venirepersons; (2) whether the court erred when it did not require the State to articulate a reason for its challenge to an African-American venireperson; (3) whether he was denied effective assistance of counsel when his attorney failed to move for the dismissal of the charges because he was not tried within the statutory time limit (Ill. Rev. Stat. 1985, ch. 38, par. 103—5); and (4) whether he was denied his Federal right to a speedy trial.

Defendant raises the following issues relative to the guilt phase of the trial: (1) whether the court erred in admitting evidence under the co-conspirator exception to the hearsay rule; (2) whether he was denied his constitutional rights when Gant's out-of-court testimony was admitted through the testimony of third persons; (3) whether he was denied a fair trial when the prosecutor asked leading questions of the State's key witness; (4) whether the State's remarks during closing argument denied him a fair trial; and (5) whether the court erred in giving the jury an instruction not found within the Illinois Pattern Jury Instructions, Criminal (2d ed. 1981) (hereinafter IPI Criminal 2d), relative to felony-murder.

Defendant raises the following issues concerning the sentencing hearing: (1) whether the court improperly in-

structed the jury at the eligibility phase of the death penalty hearing and thus sentenced him in an arbitrary and capricious manner; (2) whether the court erroneously instructed the jury at the aggravation and mitigation phase of the hearing; (3) whether his death sentence should be vacated where the statutory aggravating factor was also an element of the home invasion offense; (4) whether the prosecutor's remarks during the aggravation and mitigation phase were in violation of Federal and State law; (5) whether unreliable aggravating evidence was admitted at the second stage of the hearing; and (6) whether his death sentence should be vacated because an alternate juror served in place of an original juror during the second phase of the death penalty hearing.

Lastly, defendant challenges the constitutionality of the death penalty.

The State presented the following evidence at defendant's trial. Charles Roof, a Hazel Crest police officer, testified that he and his partner responded to a call at a townhouse building located at 2125 West 171st Street. When he arrived, he saw a woman yelling from an upstairs window. He entered the residence and proceeded to an upstairs bedroom where he saw a hysterical woman (Regina Dunn) handcuffed to a man (Derrick Quincy Wilkinson). He rolled the man over and "observed a large amount of blood from approximately his neck to his waist." The paramedics were called and they cut the chains that linked the two victims together.

Regina Dunn was called to the witness stand and her testimony was as follows: she lived at 2125 West 171st Street with her three children and her fiancee, Wilkinson; her fiancee operated a business in which he repaired and rented electronic equipment; on occasion, he would bring some of the equipment home; on July 31, 1986, she was awakened by someone who covered her face, put a

sharp object to her neck, and threatened to kill her if she moved; she was unable to see who was in the room, but she thought there were at least two people in the bedroom because she remembered hearing two different voices; she was gagged, her feet were tied, and after hearing "metal rattling," she felt a brace placed around her wrist; the intruders left the bedroom and she heard them go downstairs; she then heard things being rolled out the front door; after she no longer heard noises from downstairs, she sat up and shook the pillow from her face; she noticed that Wilkinson was lying on his stomach and that his hands were cuffed behind his back; her hands were cuffed in front of her, but they were pulled to one side because her hands were linked to Wilkinson; she hollered from the window for help and, eventually, police and fire department personnel came to her aid; as she was taken to an ambulance, she noticed that the contents of her purse, as well as the contents of her fiancee's wallet, were strewn about the room; she also noticed that her car, a 1972 Chevrolet Nova, and her fiancee's automobile, a 1975 Blazer, were missing; after being released from the hospital, she noticed a number of electronic items at her home were also missing; she told the police that a scratched Teac cassette player and a General Electric video cassette recorder (VCR) were missing; and she knew Joseph Gant because when her girl friend Martha Travis and Travis' five children lived with her at the townhouse (from the fall of 1985 to the spring of 1986), Gant would visit one of Travis' daughters.

Dr. Eupil Choi conducted a postmortem examination of Wilkinson and found that he died as a result of a single stab wound to the chest.

Edward O'Brien, an evidence technician employed by the Hazel Crest police department, testified as follows: on August 1, 1986, he was assigned to work on the

Wilkinson homicide and he traveled to the scene of the crime; while there, he found, at a distance of approximately 50 feet from Dunn's townhouse, a butcher knife lying in the street—the knife tested negative for blood stains and no suitable fingerprints were found on it; he recovered two pairs of handcuffs, one pair was taken from Dunn and the other pair was taken from Wilkinson; during the night of August 1, 1986, he went to Chicago and photographed a Chevrolet Nova that belonged to one of the victims; the car was located at the southeast corner of St. Louis and Ohio Streets; he retrieved a serrated steak knife from the floor of the car—the knife tested negative for blood stains and one print was found on it, but it did not compare with defendant's prints or anyone else believed to be connected to the case; and on August 7, 1986, he photographed the other vehicle that was reported missing from the Dunn residence, a Chevrolet Blazer.

Gerald Jackson, a Hazel Crest resident, testified as follows: he knew Gant and he saw defendant and Gant "together a lot"; he received a telephone call from Gant at about 10 p.m. on July 31, 1986; during this phone call, Gant told him that he wanted Jackson's handcuffs because he and the defendant were going to a disco and that they intended to wear the handcuffs on their belt and "mess around with them"; Jackson put two sets of handcuffs and two sets of keys in his mailbox; Gant was going to pick up the handcuffs sometime after their phone call; the following day, August 1, 1986, he looked in his mailbox and noticed that the handcuffs and keys were gone; and he identified the State's exhibits as his two handcuffs, but noted that the handcuffs were now cut apart.

Bartholomew Veal, a former high school classmate of the defendant, testified as follows: on July 29, 1986, Gant visited his house and stated that he and the defend-

ant wanted to burglarize a house at 171st Street in Hazel Crest; Gant informed him that "VCRs, color t.v.s, stereo equipment, [and] all types of electronic equipment" were at this location; Veal told Gant that he did not want to get involved; on July 30, 1986, Gant returned to Veal's house, but this time he was accompanied by the defendant; they each asked Veal if they could use Veal's mother's gun and Veal answered no; defendant and Gant then told Veal that they planned to break into a residence on 171st Street wearing gloves and ski masks, and that they were going to handcuff and gag the occupants of the home; on August 1, 1986, he learned from a news report that someone was murdered at 171st in Hazel Crest; the following day he telephoned Gant and recognized defendant's voice as the party who answered the phone; Veal told defendant, " 'You guys did it' "—defendant then hung up the phone; defendant and Gant visited his house on August 3, 1986, and they brought a turntable and two VCRs with them; they asked Veal if he could "get rid of them"; Veal decided not to get involved and he then made a number of anonymous phone calls to the Hazel Crest police department in which he named Gant and the defendant as the perpetrators of the crime on 171st Street.

Gary Jones, a detective employed by the Hazel Crest police department, testified as follows: he was assigned to investigate a homicide at 2125 West 171st Street; Gant was named by Dunn as a possible suspect, so he interviewed Gant; after he talked with Gant, he interviewed a woman named Dee Ramey (defendant's sister) who resided at 658 North Christiana in Chicago; on August 1, 1986, he learned that a car matching the description of Dunn's car was found in Chicago; he then traveled to a vacant lot at the intersection of St. Louis and Ohio Streets in Chicago, where he found a Chevrolet Nova that was registered to Dunn; the lot was located

approximately two blocks from Dee Ramey's residence; on August 7, 1986, he learned that an automobile which belonged to Wilkinson was recovered in Chicago; he traveled to the 3500 block of West Chicago Avenue where he found a Chevrolet Blazer abandoned in an alley; the Blazer was located "[t]wo to three blocks away" from Dee Ramey's residence; Jones was given two handcuff keys from Jackson and the keys operated the handcuffs that were removed from Dunn and Wilkinson; he received an anonymous tip that the defendant was attempting to sell stolen VCRs; and he then contacted the State police and requested assistance.

Two State police officers, Jeffery Vlcek and Eric Echols, testified that they assisted the Village of Hazel Crest in the investigation of a burglary. While working undercover, Vlcek purchased a VCR from the defendant and Echols purchased a Teac cassette player from him also. These two items matched the description of the electronic equipment reported stolen by Dunn.

The following evidence was admitted by way of stipulation: blood stains found at the crime scene were analyzed; except for a blood stain found on a pillow case (in which the blood found there could have originated from Dunn or the defendant), nearly all other blood stains that were tested could have originated from Wilkinson or Gant; and defendant's and Gant's prints were found on a Panasonic Omnivision set—an item "which was not a proceed from the crime."

John Campbell, who had three prior felony convictions, met the defendant while they were both incarcerated in the Cook County jail. Campbell testified that defendant told him the following information about a home invasion that defendant admitted he had committed in Hazel Crest: defendant and two other guys, one named Joe, planned a burglary of a home in Hazel Crest because it contained "unique stereo and video equip-

ment"; Joe had secured some handcuffs and defendant was pushed through an open window of the house; they entered a bedroom occupied by two adults; Joe restrained the woman and defendant "hit [the man] a couple of times with the knife"; the man and woman were both handcuffed; stereo and video equipment was loaded into one of the victims' cars; and they drove from the scene of the crime in the victims' cars and took the equipment to defendant's sister's house on North Christiana in Chicago. Campbell contacted the State's Attorney's office and informed it of what defendant had told him. Campbell stated that he informed the authorities because he hoped it would affect his prison sentence and he also considered the murder hideous.

The defense called Annabelle Haywood, defendant's legal guardian, who testified that on August 2, 1986, Gant and defendant entered the bedroom of her home. Gant then offered to sell her a VCR, but she refused to buy it. Haywood further testified that defendant's older sister, Dee Ramey, lived at 648 North Christiana, and that during the months of July and August 1986, defendant would sometimes stay over at his sister's house.

Robert Ross testified that in the latter part of July 1986, he, defendant, defendant's brother Sean, Michele Kelly, and Lorenzo Crockett went to Dee Ramey's house in Chicago. He socialized at Dee's place after midnight. He and defendant fell asleep, and the next morning, they returned to Hazel Crest.

Michele Kelly, who dated Sean Ramey, testified that on the night of July 31, 1986, and into the early morning hours of August 1, 1986, she, along with Sean Ramey, Crockett, Ross, and the defendant, gathered at Dione (Dee) Ramey's house on North Christiana in Chicago. As she left Dee's house around 2 a.m., she recalled that Ross and the defendant were still there.

The defendant's testimony essentially corroborated the testimony of Ross and Kelly as to the events of July 31, 1986. Defendant also stated that Gant came to his house and attempted to sell a VCR. Defendant later purchased some electronic equipment from Veal and he sold two items to the two State police officers who had previously testified. On November 26, 1986, he spoke with two Hazel Crest police officers who told him details of a crime that had been committed. According to the defendant, he merely related to Campbell what the police had told him.

The jury found the defendant guilty of Wilkinson's murder. He was found eligible for the death penalty, and after a hearing in aggravation and mitigation, the jury sentenced defendant to death.

## PRETRIAL ISSUES

Defendant's first contention is that his equal protection rights were denied when the State peremptorily challenged three African-American venirepersons. The record shows that of four African-Americans who survived a challenge for cause, the State exercised peremptory challenges against three of them. On the other hand, of nine non-African-American venirepersons who survived a for-cause challenge, only three were excused by the State. During jury selection, defendant objected to the State's use of its peremptory challenges against African-American venirepersons. The court found that a *prima facie* showing of discrimination had been made, and ordered the State to provide a race-neutral explanation for the challenges to venire members Patricia Stevens, Percy Gray, and Michael Jones.

*Stevens.* The State maintained that it struck this venireperson because of: her "physical characteristics and her mannerisms"; her nervousness; her hesitation in answering questions; "the kind of answers she gave";

the way she responded to questions that were asked in accordance with *Witherspoon v. Illinois* (1968), 391 U.S. 510, 20 L. Ed. 2d 776, 88 S. Ct. 1770 (questions are asked in order to find out veniremembers view of capital punishment); and the fact she had served as a juror in a civil matter.

*Gray.* The State reasoned that he was a church deacon and was equivocal "[i]n his answers to the *Witherspoon* questions." Several of the questions during *voir dire* had to be repeated and "[h]e appeared outwardly confused by way of his demeanor and mannerisms." In addition, the State opined "that he was confused over simple matters of law." The State noted further that he had previously served as a juror.

*Jones.* In response to questions asked pursuant to *Witherspoon*, he initially stated that he had strong feelings against the death penalty. The State also commented that "[h]e hasn't worked in over three years." His mannerisms and demeanor caused the State some concern. Moreover, the State supplied the court with a criminal history sheet of a person named Jones, whose birthday was the same as the venireperson.

The court ruled:

> "I have considered it very carefully and thought about this motion very carefully, and there was equivocation on the part of Stevens and Gray and, frankly, of Michael Jones. And their demeanor and the manner in which they answered questions caused some doubt in my mind. I have the notes here in my book, but I'm—I'm going to tell you, State, you're very close to having a mistrial declared in this matter. And unless I see a demeanor and equivocation, I don't care what you see. You're very close to having a mistrial declared in a *Batson* situation in this matter."

In *Batson v. Kentucky* (1986), 476 U.S. 79, 96-97, 90 L. Ed. 2d 69, 87-88, 106 S. Ct. 1712, 1723, the Supreme

Court held that the equal protection clause prohibits the prosecution's use of peremptory challenges as a means to exclude prospective jurors on account of their race; and after a defendant has established a *prima facie* case of purposeful discrimination in the removal of venire members, the burden of proof is shifted to the State. The State must then provide " 'a neutral explanation for challenging black jurors. \*\*\* The prosecutor \*\*\* must articulate a neutral explanation related to the particular case to be tried. The trial court then will have the duty to determine if the defendant has established purposeful discrimination.' " *People v. Young* (1989), 128 Ill. 2d 1, 17, quoting *Batson*, 476 U.S. at 98, 90 L. Ed. 2d at 89, 106 S. Ct. at 1724.

The trial judge is in the best position to evaluate the reasons given by the State for its use of peremptory challenges and " '[s]ince the trial judge's findings in the context under consideration here largely will turn on evaluation of credibility, a reviewing court ordinarily should give those findings great deference.' " (*Young*, 128 Ill. 2d at 21, quoting *Batson*, 476 U.S. at 98 n.21, 90 L. Ed. 2d at 89 n.21, 106 S. Ct. at 1724 n.21.) A judge's findings as to whether the State purposefully discriminated against venire members will not be disturbed on review unless the reviewing court, after examining the record as a whole, determines that the judge's findings were clearly erroneous. (*Hernandez v. New York* (1991), 500 U.S. 352, 369, 114 L. Ed. 2d 395, 412, 111 S. Ct. 1859, 1871.) After reviewing the record in the present case, we conclude that no clear error was committed when the trial judge concluded that the State did not discriminate against the aforementioned African-American venirepersons.

Defendant argues that the court's ruling was erroneous because the State cited prior jury service as a reason to exclude African-American venirepersons and yet non-

African-Americans who had previously served as jurors were not peremptorily challenged.

"In *People v. Young* (1989), 128 Ill. 2d 1, 23, we observed that if a prosecutor rejected a minority venireperson for possessing certain characteristics, but did not reject a white venireperson sharing those same characteristics, 'it does not follow that this in itself shows that the prosecutor's explanations were pretextual.' We explained that:

'Though a part of the prosecutor's explanations may have been applicable to white jurors who were not challenged, the white jurors may have, in some other respect, exhibited a trait which the prosecutor reasonably could have believed would make him or her desirable as a juror.' (*Young*, 128 Ill. 2d at 23-24.)

Likewise, the converse is true as well. Though a minority venireperson may otherwise possess all of the traits which the State is looking for in a juror, he may possess an additional trait which makes him undesirable." *People v. Harris* (1989), 129 Ill. 2d 123, 179-80.

It appears from the record that the demeanor of Stevens, Gray, and Jones rendered them undesirable jurors in the eyes of the State. Defendant correctly notes that "explanations which focus upon a venireperson's body language or demeanor must be closely scrutinized because they are subjective and can be easily used by a prosecutor as a pretext for excluding persons on the basis of race." (*Harris*, 129 Ill. 2d at 176.) Nevertheless, the record shows that the judge paid careful attention to the demeanor of the venirepersons and he scrutinized the State's reliance on this factor as its reason behind challenging the venirepersons. Under these circumstances, we conclude that the court's findings were not clearly erroneous.

Defendant next contends that the court erred in the way it conducted the *Batson* hearing as to venireperson Loretta Cockrell because the State never articulated an

explanation regarding its challenge to Cockrell. The State maintains that it had many reasons to exclude Cockrell, but admits "that the reasons came from the judge not the prosecutor."

The court, after finding that a *prima facie* showing had been made, did not shift the burden to the State, and thus, it did not require the prosecution to explain why it peremptorily challenged Cockrell. Instead, the court, without asking the State to offer an explanation, stated:

> "The question before the Court is a continuing one on the *Batson* situation, as far as Loretta Cockrell is concerned and, gentlemen, I am going to rule, at this point in time, that there was more than ample neutral reasons, evidence before this court, by her answers and mannerisms, and there is no *Batson* violation."

The procedure to be followed in a *Batson* hearing is quite clear.

> "Under *Batson*, once a *prima facie* case of discrimination has been established, *the State has the burden of coming forward with a neutral explanation* for excluding each black venireperson which is 'related to the particular case to be tried.' (*Batson*, 476 U.S. at 98, 90 L. Ed. 2d at 88, 106 S. Ct. at 1723.) ***
>
> Once *the State has come forward with its reasons* for striking the venirepersons, the trial court must then determine whether the explanations are sufficient to rebut defendant's *prima facie* case." (Emphasis added.) (*Harris*, 129 Ill. 2d at 174.)

"[A] court should not presume, or infer from the facts of the case, that an unarticulated neutral explanation exists. (See *Uviedo*, 738 F.2d at 1430.) Rather, a court must focus its inquiry on the reasons actually articulated by the State." (*Harris*, 129 Ill. 2d at 184.) "*Uviedo* *** requires us to hold that although the record may disclose an explanation for the exercise of a challenge, that explanation cannot be found to be adequate by either the

trial court or a court of review, *unless the prosecutor articulated that as a reason for exercising a peremptory challenge.*" (Emphasis added.) *Harris*, 129 Ill. 2d at 194 (Ryan, J., concurring in part and dissenting in part, joined by Miller, J.).

Here, the State never articulated a single reason why it challenged Cockrell. A court cannot properly determine whether the defendant has proven that the State engaged in racial discrimination until the prosecution has explained why it had exercised peremptory challenges against certain venirepersons. See Serr & Maney, *Racism, Peremptory Challenges, and the Democratic Jury: The Jurisprudence of a Delicate Balance*, 79 J. Crim. L. & Criminology, 1, 64 (1988) ("the prosecutor's explanation must be the focal point of judicial scrutiny if *Batson*'s protections are to have any meaning at all").

Nevertheless, we find that defendant has waived his claim that the trial court erred in denying his *Batson* motion without first requiring the State to explain why it had challenged Cockrell. After Cockrell was excused by the State, defendant made a *Batson* motion. The trial judge found that a *prima facie* case was made, and that no *Batson* violation had occurred because he presumed, based on Cockrell's answers and mannerisms, that the State had ample reasons to strike her from the jury. Defense counsel made no objection to the fact that the State was not called upon to explain why it had challenged Cockrell. "An accused may not sit idly by and allow irregular proceedings to occur without objection and afterwards seek to reverse his conviction by reason of those same irregularities." *People v. Ford* (1960), 19 Ill. 2d 466, 478-79. See, *e.g.*, *State v. Robinson* (1991), 305 S.C. 469, ___, 409 S.E.2d 404, 407 (defendant waived claim that error occurred because solicitor did not explain why a juror was stricken because he failed "to raise it below"); *State v. Martinez* (1987), 294 S.C. 72,

73, 362 S.E.2d 641, 642 (argument was improperly before court where defendant complained that solicitor did not explain why a juror was stricken because defendant did not "raise this objection to the trial judge").

Defendant next contends that he was denied his right to the effective assistance of counsel due to his attorney's failure to move for the dismissal of the criminal charges because he was not tried within the 120-day time period under the speedy trial statute (Ill. Rev. Stat. 1985, ch. 38, par. 103—5(a)). The speedy trial statute provides in relevant part:

> "Every person in custody in this State for an alleged offense shall be tried by the court *** within 120 days from the date he was taken into custody unless delay is occasioned by the defendant ***." Ill. Rev. Stat. 1985, ch. 38, par. 103—5(a).

Whether a defendant has been denied his constitutional right to the effective assistance of counsel is determined by applying the *Strickland* test, which requires the defendant to show two things: "(1) counsel's representation fell below an objective standard of reasonableness, and (2) counsel's substandard representation so prejudiced the defense as to deny the defendant a fair trial." (*People v. Horton* (1991), 143 Ill. 2d 11, 23.) Under part one of the test, it is strongly presumed that the actions of counsel were not the result of incompetence, but were the product of sound trial strategy. *People v. Steidl* (1991), 142 Ill. 2d 204, 240.

Defendant maintains that his trial was delayed by 168 days and that this delay was not occasioned by him. However, the State maintains that defendant was tried within the 120-day period, because, it argues, defendant "either caused the delay or consented to it." After carefully reviewing the record, we find that counsel's failure to move for the discharge of his client was a sound strategic decision and not incompetence. See *People v. Keys*

(1990), 195 Ill. App. 3d 370 (whether to demand a speedy trial is a strategic matter reserved for defense counsel).

At a pretrial hearing on October 6, 1988, the following colloquy occurred between defense counsel and the court:

"MR. FLETCHER [Defense attorney]: For the record, Judge, Kenneth Fletcher, from the Multiple Defendant Division, on behalf of Mr. Ramey present before the Court.

Your Honor, I had talked to Mr. Simmons about this matter earlier this morning. He indicated to me that Mr. Gant's motions were set for October 25th, and that after these were completed, he expected to go into trial on his behalf.

I agreed with him to continue this case until November 7th. However, I have had the opportunity to talk to my client after that, and he has indicated to me, Judge, that he wishes to demand trial.

I have had the opportunity to talk with Mr. Ramey at some length today for about I would say fifteen or twenty minutes, and I have explained to him my reasons for wishing to go along with a by-agreement date with the State. *I have some specific strategic and tactical reasons which I believe make it imperative that we agree with the State, and not demand trial.*" (Emphasis added.)

Thereafter, defendant advised the court that he would like to demand trial, but nevertheless indicated that he wanted Fletcher to remain as his defense counsel and the case was continued.

At a subsequent pretrial hearing on January 4, 1989, defendant's attorney again advised the court that he did not want to demand trial:

"MR. FLETCHER: For the record, Judge, Kenneth L. Fletcher on behalf of Mr. Ramey who is present before the court.

Judge, the case was set over for a constitutional motion. And the motion is going to be set over until the eleventh, I believe, next week.

Judge, at this time Mr. Ramey has indicated that it is his intention to demand trial. *I have had a long conversation with Mr. Ramey in which I explained to him that that is against my better judgment for a number of reasons, which I won't go into.*

Mr. Ramey—at this time I think it is incumbent upon me, since I don't believe I can be ready for trial to the best of my ability by the time that's dictated in the term, I am going to request leave to withdraw at this time." (Emphasis added.)

Defense counsel's motion was denied and the case was continued to January 11, 1989.

On January 11, 1989, defense counsel again advised the court that in his judgment, he thought the case should be continued:

"MR. FLETCHER: Ken Fletcher, Multiple Defendants Division.

Judge, since you are leaving on vacation and you are not going to be back when this is tried, Mr. Simmons [the prosecutor] and I both feel it would be best if the motions are heard by the same judge. So, we set this for motions on January the 25th."

The case was continued until the January 25, 1989. As is plainly evident from the portions of the record set forth above, defense counsel's strategy was to continue the case and not demand trial. Under these circumstances, counsel's conduct cannot be considered to be incompetent.

Defendant next contends that he was denied his Federal right to a speedy trial. While section 103—5 is designed to effectuate a defendant's constitutional right to a speedy trial, the statute and the constitutional right are not necessarily coextensive with each other. (*People v. Jones* (1984), 104 Ill. 2d 268, 286.) "In determining

whether there has been a breach of the constitutional right to a speedy trial, four factors are considered: the length of the delay; the reasons for the delay; the prejudice to the defendants; and whether the defendants waived that right." *Jones*, 104 Ill. 2d at 286.

Defendant was in custody on other charges when he was indicted for the instant crimes on December 19, 1986. He was not brought to trial until March 23, 1989, some 824 days later. Defendant argues that 168 days were not attributable to him, thus conceding by implication that over three quarters of the delay was occasioned by him.

Defendant contends that he was prejudiced by the delay because the State remarked during its closing argument that he had over three years in which to concoct excuses about his involvement with the victim's electronic equipment. This remark alone cannot be considered so prejudicial that his right to a speedy trial was denied. Closing argument is not evidence (IPI Criminal 2d No. 1.03)), and he cannot be heard to complain of the remark, especially where defendant contributed to much of the delay.

## TRIAL

Defendant next contends that Gant's out-of-court statements to Veal and Jackson were improperly admitted under the co-conspirator exception to the hearsay rule "[b]ecause the State failed to make an independent *prima facie* evidentiary showing of conspiracy between Mr. Ramey [defendant] and co-conspirator Gant." Conversely, the State maintains that the requisite *prima facie* showing of a conspiracy had been made.

The exception to the hearsay rule for declarations of a co-conspirator was set forth in a recent opinion of this court:

" '[S]uch declarations are admissible against all conspirators upon an independent, *prima facie* evidentiary showing of a conspiracy or joint venture between the declarant and one of the other defendants, insofar as such declarations are made in furtherance of and during the pendency of the conspiracy, even in the absence of a conspiracy indictment.' " (*Steidl*, 142 Ill. 2d at 234, quoting *People v. Goodman* (1980), 81 Ill. 2d 278, 283.)

After reviewing the record in the present case, we find that the State made a *prima facie* showing of a conspiracy between defendant and Gant.

Veal testified that on July 30, 1986, one day prior to the commission of the crime, defendant and Gant came to his house. Veal stated that while in the kitchen of his house, defendant told him that he intended to break into a house on 171st Street and that the occupants were going to be handcuffed and gagged. Veal further testified that on August 3, 1986, he saw defendant and Gant together again, but on this occasion, they brought with them two VCRs and a turntable, and defendant then asked him if he could get rid of the three pieces of electronic equipment. Campbell also testified as to the existence of a conspiracy between defendant and Gant: that defendant told him that he *planned* a burglary of a home in Hazel Crest with a person named "Joe" and another person who was not identified by name; that this home contained "unique stereo and video equipment"; that Gant secured some handcuffs; and that they entered the home and handcuffs were used on two individuals within the home. The above evidence amounts to a *prima facie* showing that defendant and Gant entered into a conspiracy.

Defendant also contends that the statement made by Gant to Veal on August 3, 1986, was inadmissible under the co-conspirator exception to the hearsay rule because the conspiracy had already ended and the statement was

not made for the purpose of concealing the conspiracy. (*People v. Parmly* (1987), 117 Ill. 2d 386.) The State maintains that the conspiracy had not ended on August 3, 1986, because it encompassed the sale of the stolen electronic equipment by defendant.

In *Parmly*, the prosecution sought to admit hearsay statements that were made after the real objective of the conspiracy was completed. The prosecution then moved to have the statements admitted "as furthering a subordinate conspiracy or an extension of the conspiracy to conceal the offenses." (*Parmly*, 117 Ill. 2d at 393.) However, in the present case, the court ruled that "the conspiracy was still in operation" on August 3, 1986, when Gant asked Veal to get rid of some electronic equipment. The court's ruling was correct in that the evidence shows that the conspiracy was to invade the victim's house, take the electronic equipment located there, and sell it. Therefore, the statement was properly admitted, as it was made during the pendency of the conspiracy and there was no need to show that the statement was made in order to conceal the conspiracy.

Defendant also contends that the admission of Gant's out-of-court statements denied him his constitutional right to confront witnesses. The State maintains that defendant's constitutional rights were not violated.

In *People v. Davis* (1970), 46 Ill. 2d 554, 557-59, the court held that the admission of hearsay under the co-conspirator exception to the hearsay rule did not violate the confrontation clause of the sixth amendment, because the defendant had the opportunity to cross-examine the individuals who claimed that certain statements were made to them. The Supreme Court's opinion in *Dutton v. Evans* (1970), 400 U.S. 74, 27 L. Ed. 2d 213, 91 S. Ct. 210, bolstered this court's decision in *Davis*. *Goodman*, 81 Ill. 2d at 285.

In *Dutton*, a prosecution witness testified about a conversation he had with a fellow inmate. The witness' testimony as to what this inmate told him, although hearsay, was admitted under Georgia's co-conspirator exception to the hearsay rule. Defendant argued that the admission of the inmate's out-of-court statement violated his constitutional right to confront the witnesses against him. After applying a number of factors to the content of the statement itself and the circumstances in which the statement was made, the Court held that the defendant was not denied his confrontation rights under the sixth amendment. *Dutton*, 400 U.S. at 87-89, 27 L. Ed. 2d at 226-27, 91 S. Ct. at 219-20; accord *People v. Schmitt* (1989), 131 Ill. 2d 128, 141-42.

In the present case, defendant contends that the admission of Gant's four out-of-court statements through the testimony of Veal and Jackson failed to satisfy one of the factors announced in *Dutton*: that the testimonial evidence of Veal and Jackson as to what Gant had allegedly told them was crucial and devastating, because "[w]ithout these statements, the State would have had only the testimony of Campbell with which to attempt to convict [him]." We disagree and find that none of the four statements was crucial or devastating given the other evidence presented at trial.

According to the first statement, Jackson testified that Gant asked to use his handcuffs because he and the defendant were going to a disco. However, the defendant admitted to Veal that the handcuffs were going to be used for another purpose. Veal testified that defendant told him that "[t]hey was [*sic*] going to handcuff them, gag them, [and] wear ski masks." Moreover, Campbell testified that defendant told him that "Joe [Gant] secured some handcuffs from somewhere" and that a man and woman were handcuffed together.

In the second statement complained of, Gant allegedly asked Veal if he could use Veal's mother's gun because he intended to commit a burglary with defendant. Again, the defendant himself asked Veal if he and Gant could use Veal's mother's gun because they intended to break into a residence on 171st Street. The third and fourth statements were similarly not crucial or devastating, as it appears from the record that defendant essentially made the same statements that Gant was alleged to have made. Thus, we find that no confrontation violation occurred because the four out-of-court statements were not crucial or devastating.

Defendant next contends that he was denied a fair trial when the prosecutor asked leading questions of prosecution witness Campbell in an attempt to bolster his credibility and disparage defendant's. The State maintains that defendant has waived his right to have this issue reviewed in this court because no objection was made at trial. Defendant urges this court to review the challenged testimony under the plain error rule (134 Ill. 2d R. 615(a)).

Defendant complains of the following exchange of questions and answers between the assistant State's Attorney and Campbell:

"MR. SIMMONS [Assistant State's Attorney]: May I have just a moment, Your Honor?

Isn't it a fact that you are requesting that you serve your time in a medium security facility because, after testifying on your behalf, to serve time in a maximum security institution would endanger your life?

A. Yes.

* * *

MR. SIMMONS: We did agree that if you are convicted on your pending charge, that we would recommend that you do not serve any time that you may receive in the same institution as Irving Ramey, is that correct?

A. Yes.

Q. And we did agree that you would not be transported to this courtroom to testify in the same vehicle as Irving Ramey might be transported in, is that correct?

A. Yes."

Defendant contends that "[t]he prosecutor's own unsworn testimony that Campbell placed his life in danger by testifying and Campbell's testimony that he demanded DOC placement and transport separate from Mr. Ramey because of the fear of Mr. Ramey were not based on the evidence in this case."

To preserve an issue for review in a reviewing court, an objection must be made at trial and the complained-of error must be included in a post-trial motion. (*People v. Enoch* (1988), 122 Ill. 2d 176.) Errors which have not been properly preserved for review can still be reviewed under the plain error rule in two circumstances: (1) if "the evidence in a criminal case is closely balanced"; or (2) if "the error is so fundamental and of such magnitude that the accused was denied a fair trial." (*People v. Mink* (1990), 141 Ill. 2d 163, 172.) We decline to review the alleged error in the first instance, as the evidence cannot reasonably be considered closely balanced. Secondly, the alleged error was not so fundamental and prejudicial that defendant was denied a fair trial.

Defendant next contends that the State made some remarks during its closing rebuttal argument that were prejudicial, and thus denied him his right to a fair trial. The first prosecutorial remark that defendant complains of is as follows:

"MR. SIMMONS [Assistant State's Attorney]: ***

Do you think you know who chose John Campbell as a witness? He did, not the State, not the People of the State of Illinois, he chose that person as his witness, and they say he has got nothing to lose when he hits the stand.

Let me tell you something, as soon as he left that stand, and use your common sense, as soon as John

Campbell left that stand, and he is back in that peniten-
tiary, they know he is a stoolie, and—

MR. FLETCHER [Defense attorney]: Objection.

MR. GOLDBERG [Defense attorney]: No evidence of
that.

THE COURT: Objection sustained.

MR. FLETCHER: We ask the Jury to disregard.

THE COURT: Disregard that.

MR. SIMMONS: Let me tell you something, he has
nothing to lose.

   \* \* \*

We didn't cut any deals with him, he has to face the
pending armed robbery, whatever he gets he gets, he gets
it, the only thing we said is that you don't have to do the
time in the same penitentiary as this murderer, and that
is the least that anyone can do for somebody who is a
stoolie."

Any harm which could have resulted from the State's
initial reference to Campbell as a "stoolie" was allevi-
ated after the court sustained the objection and in-
structed the jury to disregard the remark. (*People v.
Carlson* (1980), 79 Ill. 2d 564, 577.) (We note that while
defendant contends that the record does not support the
State's "stoolie" remark, defendant has characterized
Campbell as a "jailhouse snitch" in his reply brief.) How-
ever, defendant contends that after the objection was
sustained, the State persisted in pursuing this improper
line of argument, which he claims eliminated the salu-
tary effect of the court's curative instruction. *People v.
Weinstein* (1966), 35 Ill. 2d 467.

In *Weinstein*, the State remarked five or six times,
without objection, in its closing argument that the
defendant had the burden of presenting a reasonable
doubt of guilt. Defense counsel's objection was sustained
after the State made an additional reference to the
defendant's having a burden of creating a reasonable
doubt. In *Weinstein*, the court found that the prejudicial

error was not avoided by virtue of the court's sustaining defendant's objections because the State was persistent in repeatedly asserting that defendant had to create a reasonable doubt of guilt. The prosecutor's "constant repetition" in *Weinstein*, 35 Ill. 2d at 471, of the incorrect premise that defendant had the burden of raising a reasonable doubt as to her guilt does not compare whatsoever to the closing argument in the instant case.

Here, the prosecution remarked only one more time that Campbell was a "stoolie" after defendant's objection was sustained. Under these circumstances, we do not find that it rendered the court's curative instruction a nullity. Moreover, defendant did not object at trial to the prosecution's second remark and, as a result, defendant has waived the error. *People v. Bartall* (1983), 98 Ill. 2d 294, 321.

Defendant next contends that he was denied a fair trial when the prosecution made the following remarks during its closing rebuttal argument:

"MR. SIMMONS [Assistant State's Attorney]:
* * *

That is not surprising at all, but you notice that he cannot deny meeting with Bart Veal, he can't deny it, so he is going to say yes, I met with Bart Veal, but I got the proceeds of the crime from Bart Veal, that is number two, and when I am talking about these things, about how long this Defendant had time to think of convenient excuses to escape his responsibility for a murder, think about how long, almost three years—

MR. FLETCHER [Defense attorney]: Objection, Judge.

THE COURT: Overruled.

MR. SIMMONS: Almost three years, not very hard when you are sitting over there in the County Jail to think about how you are going to escape your responsibility for a brutal murder.

MR. FLETCHER: Objection, motion for a mistrial.

THE COURT: Overruled.

MR. SIMMONS: So think of that."

Defendant contends that the aforementioned argument was improper because it amounted to informing the jury that he had fabricated his defense; the remarks were not based on the evidence in that he was in custody for two years and four months, not "almost three years" as the State argued at trial; and the remarks were calculated to inflame the jury. The State maintains that the remarks were permissible because "[t]he comments say no more than that defendant's testimony is not worthy of belief, and that the evidence shows defendant guilty of murder."

The credibility of witnesses is a matter that attorneys can remark upon during their closing arguments, provided such argument is based upon the facts in the record or reasonable inferences drawn therefrom. (*People v. Flores* (1989), 128 Ill. 2d 66, 94.) A prosecution witness, Veal, testified that defendant and Gant came to his home and told him that they planned to break into a house on 171st Street; that they returned a few days later carrying a "turntable and two VCRs"; and that he informed them that he did not want to get involved because of what happened on 171st Street. On the other hand, defendant testified that he possessed what he assumed to be stolen merchandise, because Veal sold the items to him. We find the State's argument, that defendant's testimony is not worthy of belief because he had time prior to trial within which to offer an exculpatory explanation for having the victim's merchandise in his possession, to be an inference drawn fairly from the facts. We do note, however, that defendant was not incarcerated for "almost three years," but we find that the difference in time did not result in substantial prejudice to the accused. *Flores*, 128 Ill. 2d at 95.

Defendant next contends that the court erred in giving the jury the following non-IPI felony-murder instruction:

"THE COURT: The Court instructs the Jury as a matter of law that in this case to constitute the crime of murder it is not necessary for the State to show that it was or may have been the original intent of the defendant or his accomplice to kill the deceased, Derrick Quincy Wilkinson.

It is sufficient if the jury believe [sic] from the evidence beyond a reasonable doubt that the defendant and his accomplice combined to do an unlawful act, such as to commit a home invasion and that the deceased was killed by one of the parties committing that unlawful act."

Defendant argues that the above instruction is antiquated because it is based on *People v. Golson* (1965), 32 Ill. 2d 398; that it is misleading and confusing; that it overemphasized the State's theory of guilt; and that it conflicted with the IPI felony-murder instruction. Conversely, the State maintains that the instruction merely clarified the IPI instruction without misrepresenting the applicable law, and that defendant was not prejudiced by the instruction.

"The sole function of instructions is to convey to the minds of the jury the correct principles of law applicable to the evidence submitted to it in order that, having determined the final state of facts from the evidence, the jury may, by the application of proper legal principles, arrive at a correct conclusion according to the law and the evidence." (*People v. Gambony* (1948), 402 Ill. 74, 81-82, cited with approval in *People v. Hester* (1989), 131 Ill. 2d 91, 98.) Whenever applicable, an "IPI Criminal 2d instruction shall be used, unless the court determines that it does not accurately state the law." (134 Ill. 2d R. 451(a).) Furnishing additional, non-IPI instructions on subjects already encompassed by IPI Criminal 2d should

be avoided because such a practice "would defeat the goal that all instructions be simple, brief, impartial and free from argument." *People v. Haywood* (1980), 82 Ill. 2d 540, 545.

In the present case, the correct IPI Criminal 2d felony-murder instruction was used, but it was supplemented by a non-IPI instruction. A trial court has discretion to allow non-IPI instructions which cover subjects that it determines the jury should be instructed upon, and tendering such instructions is proper if they are accurate, simple, brief, impartial, nonargumentative statements of the law. 134 Ill. 2d R. 451(a).

Both parties direct our attention to *People v. Wade* (1989), 185 Ill. App. 3d 898, in which our appellate court found no error in giving an instruction very similar to the instruction at issue in the present case. Obviously, the State considers the appellate court opinion to be well reasoned, while defendant contends the case was wrongly decided.

The instruction in *Wade* read as follows:

> " 'The Court instructs the Jury, as a matter of law, that in this case to constitute the crime of murder it is not necessary for the State to show that it was or may have been the original intent of the Defendant or his co-conspirator or either of them to kill the deceased, Tyrone Tolliver. It is sufficient if the Jury believe [*sic*] from the evidence beyond a reasonable doubt that the Defendant and his co-conspirator combined to do an unlawful act, such as to take personal property from Tyrone Tolliver by force while armed with a dangerous weapon and that the deceased was killed by the Defendant or a co-conspirator in an attempt to execute such purpose.' " (*Wade*, 185 Ill. App. 3d at 904.)

The appellate court held that no error was committed in giving the above instruction because it explained concepts not covered by the IPI instruction. After considering *Wade* and the defendant's arguments against the

non-IPI instruction in the instant case, we find that the trial court did not err in instructing the jury.

Defendant argues that the non-IPI instruction unduly emphasized the State's primary theory of guilt. (*People v. Gathings* (1981), 99 Ill. App. 3d 1135.) In *Gathings*, the instructions were written such that two choices were unduly emphasized to the jury, neither one of which would result in an acquittal: the evidence showed the defendant was guilty of reckless conduct or the evidence showed he was guilty of attempted murder, attempted armed robbery and aggravated battery. (*Gathings*, 99 Ill. App. 3d at 1137.) No such choice was emphasized to the jury here, and we agree with the State and the holding in *Wade* that the instruction was explanatory and it served to clarify the concept of felony murder.

Defendant argues that the instruction improperly assumed the existence of a fact, that there was an accomplice in the case. The State maintains that after the instructions as a whole are examined, the existence of an accomplice is not presumed.

An individual instruction should not be judged in artificial isolation; rather, the instruction should be examined in light of the overall charge. (*People v. Housby* (1981), 84 Ill. 2d 415, 433-34.) The non-IPI instruction made reference to the defendant and "his accomplice." The jury was also given the accountability instruction, IPI Criminal 2d No. 5.03. We find that when the accountability instruction is read together with the instruction at issue, it could not be presumed that defendant carried out the crime with an accomplice, unless the jury, in accordance with IPI Criminal 2d No. 5.03, found that defendant could be held legally responsible for the conduct of another person. (See *People v. Hrdlicka* (1931), 344 Ill. 211, 221 (an accomplice is one who, with a common purpose of another offender, unites in the commission of a crime with the other offender).) Nevertheless,

the use of the word "accomplice" is not recommended and it would have been preferable to refer to this individual as "one for whose conduct he is legally responsible." IPI Criminal 2d No. 7.02, Committee Note.

Defendant also argues that the instruction was contrary to the felony-murder statute because: (1) according to the instruction, the predicate felony for felony-murder was not limited to home invasion, but to any "unlawful act"; and (2) the instruction did not properly define legal accountability; instead, defendant could be held legally responsible for the conduct of another if he "combined" to do an unlawful act with the other person. Again, defendant's argument must fail because it is premised on examining the instruction in isolation, rather than viewing the instruction in the context of the entire charge. *Housby*, 84 Ill. 2d at 433-34.

"Felony murder requires proof that defendant was attempting or committing a forcible felony [Ill. Rev. Stat. 1985, ch. 38, par. 9—1(a)(3)] and that there was a killing as a direct result of the commission of the felony [citation]. One may be convicted of felony murder even though he did not intend to kill anyone and did not personally kill anyone \*\*\*." (*People v. Miller* (1980), 89 Ill. App. 3d 973, 979.) While the instruction did mention "an unlawful act," it was immediately followed by the crime of home invasion (Ill. Rev. Stat. 1985, ch. 38, par. 12—11), a forcible felony. Moreover, IPI Criminal 2d Nos. 7.01 and 7.02 were provided and the jury was instructed that the defendant could be found guilty of murder if he was "committing the offense of home invasion." Also, this court must look at the word "combined" in the objected-to instruction, together with the accountability instruction. The latter instruction properly defined the circumstances under which defendant could be held legally responsible for the conduct of another. After considering the IPI instructions together with the non-IPI instruc-

tion, we find that the correct legal principles applicable to felony murder were tendered to the jury.

## SENTENCING

Defendant first contends that the sentencing jury was improperly instructed at the eligibility phase of the death penalty hearing when the court tendered the following instruction:

"Before the Defendant may be found eligible for a death sentence under the law, the State must prove the following propositions:

First: That the Defendant was 18 years old or older at the time of the commission of the murder of which he was found guilty at the trial of this case; and

Second: That the following statutory aggravating factor exists:

The murdered person was killed in the course of another felony if the murdered person was actually killed by the Defendant, or

The murdered person received physical injuries personally inflicted by the Defendant substantially contemporaneously with physical injuries caused by one or more persons for whose conduct the Defendant is legally accountable and the physical injuries inflicted by either the Defendant or the other person or persons for whose conduct he is legally accountable caused the death of the murdered person, and

The other felony was home invasion.

If you find from your consideration of all the evidence that the first and second propositions have been proved beyond a reasonable doubt, then the Defendant is eligible for a death sentence.

If you cannot unanimously find that both the first and second propositions have been proved beyond a reasonable doubt, then the Defendant is not eligible for the death sentence."

Defendant contends that his death sentence must be vacated because the court did not instruct the jury that

the State must prove that he "acted with the intent to kill the murdered individual or with the knowledge that his acts created a strong probability of death or great bodily harm to the murdered individual" (Ill. Rev. Stat. 1985, ch. 38, par. 9—1(b)(6)(b)), as required by State law. We agree.

At trial, the State tendered IPI Criminal 2d Nos. 7.01 and 7.02 which set forth various alternative theories of murder, one of those theories being felony murder. (Under the felony-murder theory, " '[i]t is immaterial whether the killing in such a case is intentional or accidental, or is committed by a confederate without the connivance of the defendant *** or even by a third person trying to prevent the commission of the felony.' " (*People v. Chandler* (1989), 129 Ill. 2d 233, 248, quoting Ill. Ann. Stat., ch. 38, par. 9—1, Committee Comments, at 16 (Smith-Hurd 1979).) After deliberating, the jury returned a general verdict of guilty on the murder charge. See, *e.g., People v. Garcia* (1983), 97 Ill. 2d 58, 84 ("the most that can be said is that the general verdict returned by the jury fails to reveal whether the jury found him guilty of actually killing anyone or whether he was convicted on the basis of accountability").

At sentencing, the State sought to have defendant declared eligible for the death penalty under section 9—1(b)(6) of the Criminal Code of 1961 (Ill. Rev. Stat. 1985, ch. 38, par. 9—1(b)(6)). Section 9—1(b)(6) provides in relevant part:

> "Aggravating factors. A defendant who at the time of the commission of the offense has attained the age of 18 or more and who has been found guilty of murder may be sentenced to death if:
>
> * * *
>
> 6. the murdered individual was killed in the course of another felony if:
> (a) the murdered individual:

(i) was actually killed by the defendant, or

(ii) received physical injuries personally inflicted by the defendant substantially contemporaneously with physical injuries caused by one or more persons for whose conduct the defendant is legally accountable under Section 5—2 of this Code, and the physical injuries inflicted by either the defendant or the other person or persons for whose conduct he is legally accountable caused the death of the murdered individual; *and*

(b) in performing the acts which caused the death of the murdered individual or which resulted in physical injuries personally inflicted by the defendant on the murdered individual under the circumstances of subdivision (ii) of subparagraph (a) of paragraph (6) of subsection (b) of this Section, *the defendant acted with the intent to kill the murdered individual or with the knowledge that his acts created a strong probability of death or great bodily harm to the murdered individual or another*; and

(c) the other felony was one of the following: armed robbery, robbery, aggravated criminal sexual assault, aggravated kidnapping, forcible detention, arson, aggravated arson, burglary, home invasion, or the attempt to commit any of the felonies listed in this subsection (c)." (Emphasis added.) Ill. Rev. Stat. 1985, ch. 38, par. 9—1(b)(6).

As the emphasized language of this aggravating factor makes clear, the State must prove that the defendant acted with the intent to kill or that he acted knowing his conduct created a strong probability that the victim would die or suffer great bodily harm. However, under the language of the instruction at issue here, the prosecution was not required to prove that the defendant acted with a culpable mental state.

The Illinois Pattern Jury Instructions, Criminal, No. 7B.07(6) (2d ed. Supp. 1987) (hereinafter IPI Criminal 2d (Supp. 1987)) provides that a culpable mental state must be proven in order to find a defendant eligible for the death penalty under the sixth aggravating factor:

"[6] The murdered person was killed in the course of another felony if

[a] [the murdered person was actually killed by the defendant,]

or

[b] [the murdered person received physical injuries personally inflicted by the defendant substantially contemporaneously with physical injuries caused by (a person) (one or more persons) for whose conduct the defendant was legally responsible and the physical injuries inflicted by either the defendant or other (person) (persons) for whose conduct he is legally responsible caused the death of the murdered person,]

and

[c] [in performing the acts which caused the death of the murdered person, the defendant acted with the intent to kill the murdered person or with the knowledge that his acts created a strong probability of death or great bodily harm to the murdered person (or another)],

or

[d] [in performing the acts which resulted in physical injuries personally inflicted by the defendant on the murdered person substantially contemporaneously with physical injuries caused by [(a person) (one or more persons)] for whose conduct the defendant was legally responsible, the defendant acted with the intent to kill the murdered individual or with the knowledge that his acts created a strong probability of death or great bodily harm to the murdered person (or another)],

and

[e] the other felony (was) *** (home invasion) ***." IPI Criminal 2d No. 7B.07(6) (Supp. 1987).

The committee note following this instruction explains the manner in which the instruction should be used and it specifically notes what the State must prove for a defendant to be found death-penalty eligible under this sixth aggravating factor.

"*Aggravating Factor (6)*. Unless there is evidence that another person contributed to the death of the victim in the manner specified by the statute, the language in subparagraphs (6)(a) and (6)[(c)] should be used. If there is evidence that another person contributed to the death of the victim in the manner specified by the statute, the language in subparagraphs (6)(b) and (6)(d) should be used instead of (6)(a) and (6)(c).

The form of this instruction should make clear that the State must prove conjunctively beyond a reasonable doubt three separate paragraphs under this factor: i) either (6)(a) or (6)(b), ii) either (6)(c) or (6)(d), and iii) (6)(e). In some circumstances the evidence may warrant an instruction on both (6)(a) and (6)(c) and (6)(b) and (6)(d)." IPI Criminal 2d No. 7B.07, Committee Note (Supp. 1987).

When the complained-of instruction is compared with the IPI instruction, it is obvious that the court did not include either subparagraph (c) or (d) of the IPI instruction. At the eligibility phase of the death penalty hearing, defendant urged the trial court that it had to include either subparagraph (c) or (d) in its instruction to the jury, but the court disagreed:

"MR. FLETCHER [Defense attorney]: I just want to point something out, and then you can rule.

Just so I have made my position clear.

This paragraph right here, this is the second paragraph under aggravating factors [*sic*] 6 in the Committee Notes. The State must prove conjunctively. That means they must prove beyond a reasonable doubt three separate paragraphs, either A, B. *Two, either C or D. You have to have one of those,* and E.

THE COURT: I disagree with that.

MR. FLETCHER: But isn't that what it says?

THE COURT: Not the way I read it." (Emphasis added.)

Thereafter, the court tendered a modified form of the IPI instruction, omitting subparagraphs (c) and (d).

At the eligibility phase of a death penalty hearing, the jury is concerned solely with answering the following threshold question: Is the defendant eligible for a sentence of death? (*People v. Lear* (1991), 143 Ill. 2d 138, 151.) Provided the sentencing hearing is conducted before a jury, a defendant can be found eligible for the death penalty only if the jury unanimously finds that the State has proven beyond a reasonable doubt the existence of at least one of the eight aggravating factors (Ill. Rev. Stat. 1985, ch. 38, pars. 9—1(f), (g)).

"Statutory aggravating circumstances define the crimes for which death may be imposed to eliminate standardless sentencing discretion and to ensure that the death penalty is not inflicted arbitrarily and capriciously. [Citation.] Aggravating circumstances thus perform the constitutionally necessary function of narrowing the class of persons eligible for the death penalty, according to an objective legislative definition." *People v. Simms* (1991), 143 Ill. 2d 154, 170.

The complained-of instruction here did not follow the language of section 9—1(b)(6) in that the State was not required to prove, and the jury was not instructed to find, that "the defendant acted with the intent to kill the murdered individual or with the knowledge that his acts created a strong probability of death or great bodily harm to the murdered individual" (Ill. Rev. Stat. 1985, ch. 38, par. 9—1(b)(6)(b)). Under the complained-of instruction, defendant could have been found eligible for the death penalty if the jury determined that he accidentally caused the victim's death.

"A certain degree of culpable conduct is necessary, under the Federal Constitution, to warrant imposition of the death penalty. In *Enmund v. Florida* (1982), 458 U.S. 782, 73 L. Ed. 2d 1140, 102 S. Ct. 3368, the Court ruled that the death penalty could not be imposed on a defendant *** who 'does not himself kill, attempt to kill,

or intend that a killing take place or that lethal force will be employed.' " (*People v. Jimerson* (1989), 127 Ill. 2d 12, 48, quoting *Enmund*, 458 U.S. at 797, 73 L. Ed. 2d at 1151, 102 S. Ct. at 3376.) An essential element which the State was required to prove in order to establish the existence of the sixth aggravating factor—a culpable mental state—was not included in the instruction to the jury. Therefore, defendant's death sentence must be vacated.

The State asks this court to consider several arguments which, in its view, require defendant's death sentence to be affirmed. First, the State maintains that since the jury returned a general guilty verdict on the murder charge, "this raises a presumption that the finding of the jury was that defendant intentionally murdered the victim" (*People v. Thompkins* (1988), 121 Ill. 2d 401), and a general verdict will support the imposition of the death penalty (*Garcia*, 97 Ill. 2d at 58). Neither *Thompkins* nor *Garcia* supports the State's position.

In *Thompkins*, a jury returned a general verdict of guilty after being instructed as to three forms of murder—intentional, knowing, and felony murder. At sentencing, *the court found him eligible for the death penalty after determining that the defendant intentionally killed the victims*. The court held that the return of a general verdict does not preclude the death penalty. (*Thompkins*, 121 Ill. 2d at 456.) In the instant case, the sentencing jury never found that the defendant acted intentionally or knowingly, whereas the court in *Thompkins* made the requisite finding under the statute.

Similarly, in *Garcia*, the defendant contended that the evidence did not *support a finding* that he committed or intended murder. On review, the court held that the evidence presented at trial "clearly demonstrat[ed] that defendant intended that lethal force would be em-

ployed." (*Garcia*, 97 Ill. 2d at 85.) Again, this case lends no support to the State's argument because, unlike the case before us, a statutory finding of intent was made at sentencing.

Second, the State argues that the court's failure to instruct the jury on the subject of intent does not require reversal because "defendant's intent was manifest from the evidence." (*People v. Jones* (1979), 81 Ill. 2d 1.) In *Jones*, the jury was not properly instructed on the crime of attempted murder. A definitional murder instruction was given to the jury which did not provide that the crime of attempted murder requires the specific intent to kill. Rather, the instruction improperly informed the jury that other mental states, such as knowledge that one's acts could cause death or great bodily harm, would suffice. The court in *Jones* held, for the following reasons, that the instructional error was not grave or substantial: the intent to kill was "blatantly evident" from the facts, which showed that defendant pointed a shotgun at the victim, the victim was shot four times in the head, and the victim had buckshot in his back; defense counsel admitted that the intent to commit murder was blatantly evident; and the error in the definitional murder instruction was minimized by a correct directive attempted murder instruction. *Jones*, 81 Ill. 2d at 10.

Turning to the instant case, the State does not argue that defense counsel conceded that the intent to kill Wilkinson was blatantly evident from the facts. In addition, the State does not direct our attention to a legally correct instruction which minimized the error of the instruction at issue. Instead, the State maintains that "the record shows that defendant's intent to kill the victim or do him great bodily harm was manifest from the evidence." After reviewing the record, we find that the instant case is not sufficiently analogous to the facts and circumstances in *Jones*. Therefore, we conclude that the

error in the eligibility instructions cannot be considered harmless.

Third, the State, relying primarily on *Cabana v. Bullock* (1986), 474 U.S. 376, 88 L. Ed. 2d 704, 106 S. Ct. 689, and *People v. Davis* (1986), 112 Ill. 2d 78, asks this court to make the necessary intent finding and affirm defendant's death sentence. Defendant, in his reply brief, contends that whether he acted with one of the required mental states under the sixth aggravating factor is a question for the sentencing jury.

In *Bullock*, a defendant was found guilty of capital murder as defined under Mississippi law and he was sentenced to death. At sentencing, the jury was not instructed that, to impose the death penalty, it was necessary to find that defendant actually killed, attempted to kill, or intended to kill the victim. The Court stated that under "*Enmund*, \*\*\* a person who has not in fact killed, attempted to kill, or intended that a killing take place or that lethal force be used may not be sentenced to death. Nonetheless, the rule remains a substantive limitation on sentencing, and like other such limits it need not be enforced by the jury." (*Bullock*, 474 U.S. at 386, 88 L. Ed. 2d at 716, 106 S. Ct. at 697.) As *Davis* recognized, *Bullock* held that the *Enmund* finding may be made on review. *Davis*, 112 Ill. 2d at 83.

However, the State, in relying on *Bullock*, overlooked a significant footnote in that opinion. The fourth footnote provides in relevant part:

"In *Hicks*, we held only that where state law creates for the defendant a liberty interest in having the jury make particular findings, the Due Process Clause implies that appellate findings do not suffice to protect that entitlement. Unlike the defendant in *Hicks*, Bullock had no state-law entitlement at the time of his trial to have the jury (or, indeed, anyone at all) make the *Enmund* findings. Of course, federal law, as later established by *Enmund*, does entitle

*Bullock* to a determination whether he killed, attempted to kill, intended to kill, or intended that lethal force be used; but, for the reasons explained in the text, the federal-law entitlement, unlike the state-law entitlement involved in *Hicks,* does not specify who must make the findings." *Bullock,* 474 U.S. at 387 n.4, 88 L. Ed. 2d at 717 n.4, 106 S. Ct. at 697 n.4.

In *Hicks v. Oklahoma.* (1980), 447 U.S. 343, 65 L. Ed. 2d 175, 100 S. Ct. 2227, a defendant was convicted and, in accordance with Oklahoma's habitual offender statute, a jury sentenced him to a mandatory 40-year prison term. Afterwards, the habitual offender statute was declared unconstitutional and the defendant petitioned to have his 40-year sentence set aside. Although recognizing that the statute was unconstitutional, an appellate court affirmed his 40-year sentence, concluding that the "sentence was within the range of punishment that could have been imposed in any event." (*Hicks,* 447 U.S. at 345, 65 L. Ed. 2d at 179, 100 S. Ct. at 2229.) The defendant appealed to the Supreme Court, contending that Oklahoma denied him his due process rights.

The Court ruled in favor of the defendant, reasoning as follows:

"It is argued that all that is involved in this case is the denial of a procedural right of exclusively state concern. Where, however, a State has provided for the imposition of criminal punishment in the discretion of the trial jury, it is not correct to say that the defendant's interest in the exercise of that discretion is merely a matter of state procedural law. The defendant in such a case has a substantial and legitimate expectation that he will be deprived of his liberty only to the extent determined by the jury in the exercise of its statutory discretion [citation], and that liberty interest is one that the Fourteenth Amendment preserves against arbitrary deprivation by the State. [Citations.] In this case Oklahoma denied the petitioner the jury sentence to which he was entitled under state law, simply on the frail conjecture that a jury *might* have imposed a sentence

equally as harsh as that mandated by the invalid habitual offender provision. Such an arbitrary disregard of the petitioner's right to liberty is a denial of due process of law." (Emphasis in original.) *Hicks*, 447 U.S. at 346, 65 L. Ed. 2d at 180, 100 S. Ct. at 2229.

Under Oklahoma law, a convicted defendant was entitled to have a jury fix his punishment. (See *Hicks*, 447 U.S. at 346 n.3, 65 L. Ed. 2d at 180 n.3, 100 S. Ct. at 2229 n.3 ("Only if the jury fails to do so may the trial court impose sentence").) Similarly, under Illinois law, if the prosecution seeks the death penalty, a defendant is entitled to have his sentencing hearing conducted before a jury. (Ill. Rev. Stat. 1985, ch. 38, par. 9–1(d).) "Section 9–1(d) of the Criminal Code of 1961 [citation] gives the defendant convicted of a capital crime the right to have a jury decide whether the death penalty should be imposed. Also under this section of the statute the defendant may waive the right of a jury determination." (*People v. Shum* (1987), 117 Ill. 2d 317, 338.) Unlike the situation in *Hicks*, the State does not ask this court to *speculate* whether the jury would have found defendant eligible for the death penalty had it been properly instructed in the first instance. (See *Clemons v. Mississippi* (1990), 494 U.S. 738, 746, 108 L. Ed. 2d 725, 737, 110 S. Ct. 1441, 1447 ("when state law creates for a defendant a liberty interest in having a jury make particular findings, speculative appellate findings will not suffice to protect that entitlement for due process purposes"), citing *Hicks*, 447 U.S. 343, 65 L. Ed. 2d 175, 100 S. Ct. 2227.) Rather, the State maintains that this court should assume the jury's fact-finding role and determine from the record whether defendant acted with the requisite culpable mental state. Nevertheless, we decline the State's invitation for the following reason.

While this court independently evaluates the record when a death sentence has been imposed (*People v. Barrow* (1989), 133 Ill. 2d 226, 283), this court acts as a court

of review and, as such, we defer to the findings made in the trial court when there is ample support in the record (*Barrow*, 133 Ill. 2d at 283). According to the death penalty statute, the trial court or the jury has the responsibility of deciding whether the defendant is eligible for a death sentence. (Ill. Rev. Stat. 1985, ch. 38, par. 9—1(d).) Even if it were proper for us to make the intent finding, this court's ability to do so is limited because whether defendant acted with the requisite mental state hinges, to some extent, on the credibility of Campbell's testimony. Credibility determinations cannot be accurately made by simply referring to a cold, paper record. (*Bullock*, 474 U.S. at 388 n.5, 88 L. Ed. 2d at 718 n.5, 106 S. Ct. at 698 n.5.) Judging the credibility of witnesses has long been the function of the trier of fact, which is in a superior position "to evaluate their demeanor, sincerity, and the weight to be afforded their testimony than is a court of review." *People v. Wysocki* (1960), 20 Ill. 2d 62, 68.

We conclude that defendant's death sentence must be reversed and the matter remanded to the trial court for resentencing. As a result, we will address only those contentions of the defendant which are likely to recur on remand. *Simms*, 143 Ill. 2d at 173.

Defendant also contends that an implicit element of the offense of murder, stabbing with a knife, is also an element of home invasion; therefore, in his view, section 9—1(b)(6) (the victim was killed in the course of a home invasion) cannot be relied upon as an aggravating factor, because any reliance on this factor would be double enhancement. The State maintains that double enhancement did not occur because, *inter alia*, defendant's murder and home invasion convictions were based on separate conduct.

Defendant cites a number of cases to support his argument, but we find that the State's reference to *People v. Kokoraleis* (1989), 132 Ill. 2d 235, is dispositive of this

double-enhancement issue. In *Kokoraleis*, a defendant argued that section 9—1(b)(6) could not be used as an aggravating factor to support the imposition of the death penalty because the felony, aggravated kidnapping, shared a common element with the crime of murder—the same bodily harm which resulted in the victim's death also supported the aggravated kidnapping charge. This court rejected defendant's argument, concluding that "the evidence *** supports the conclusion that the victim suffered multiple acts of physical harm, and that there was not a necessary identity between the acts causing death and the acts constituting the physical harm that was an element of the aggravated kidnapping." *Kokoraleis*, 132 Ill. 2d at 280.

The felony at issue here is defined in the Criminal Code in relevant part as follows:

> "(a) A person who is not a peace officer acting in the line of duty commits home invasion when without authority he or she knowingly enters the dwelling place of another when he or she knows or has reason to know that one or more persons is present and
>         ***
> (2) Intentionally causes *any injury* to any person or persons within such dwelling place." (Emphasis added.) (Ill. Rev. Stat. 1985, ch. 38, par. 12—11(a)(2).)

We agree with the State that a double-enhancement violation did not occur, because the record would support a guilty finding on the home invasion count without any consideration being given to the knife wound. Wilkinson suffered injuries other than the stab wound to his chest: a laceration to his lower lip; a contusion to his upper lip; and a linear abrasion on his chest.

Defendant next contends that the court made improper remarks to the jury at the second stage of the sentencing hearing which he believes improperly suggested that it had to make a unanimous finding, regardless of whether its de-

cision was for or against the death penalty. The State maintains that defendant has waived the issue because the remarks were not objected to at trial and included within a post-trial motion; and alternatively, the State does not find any error in the way the jury was instructed.

The complained-of remarks are as follows:

"[THE COURT]: When you get into that Jury room you will elect a person who you have already done so, the Foreperson, but you can do so if you desire, and after you unanimously agreed on which verdict form to return, the Foreman or the Forelady will sign the top line of the proper verdict form and the rest of you will affix your signatures below.

You will advise my deputies that you have unanimously reached a verdict and you will be brought back into this courtroom to report your verdicts."

Defendant maintains that the jury was in all likelihood confused by the above remarks because it was "not told in plain and simple language that the vote of a single juror against death would result in a non-death verdict."

Trial errors which have not been properly preserved for review can still be addressed on appeal under the plain error doctrine. However, the plain error doctrine is inapplicable here. (See *People v. Fields* (1990), 135 Ill. 2d 18, 69-71.) Assuming this issue was preserved for review, any juror confusion was allayed when the court, without objection, sent a note to the jury:

"THE COURT: I propose to you sending back the following note.

When your deliberations have been concluded, if you cannot unanimously agree that Irving Ramey should receive a sentence a [*sic*] death, then all must sign the verdict form which reads, and I set it forward in total, if you do not, if you unanimously agree that Irving Ramey should receive a sentence of death, then all must sign the verdict form which reads—."

Defendant next contends that the State made a number of improper remarks to the sentencing jury during its closing rebuttal argument. First, defendant contends that the State made an improper remark which diverted the jury's attention from a relevant mitigating factor—his abused childhood. The State maintains that the remark was proper and when examined in the context of the entire argument, it was responsive to the argument of defense counsel.

In making its death penalty determination, defense counsel asked the jury to consider that defendant was abused and neglected as a child. The State then, in its closing rebuttal argument, commented as follows:

"MR. SIMMONS [Assistant State's Attorney]: * * *
* * *

There is not going to be one instruction to you saying that you are to find out the cause or why this Defendant is a murderer, we are not worried about causes.

MR. FLETCHER [Defense attorney]: Objection, Judge.

THE COURT: Overruled.

MR. SIMMONS: We are not here to find out the cause of why this convicted murderer is a murderer twice."

Defendant contends that the above remark was tantamount to the State's informing the jury that his abused childhood was not to be considered in its decision on whether to impose the death penalty.

In *Eddings v. Oklahoma* (1982), 455 U.S. 104, 71 L. Ed. 2d 1, 102 S. Ct. 869, a judge had refused to consider a defendant's troubled background as a mitigating factor. The Court found that the judge had erred in refusing to consider, as a matter of law, the defendant's upbringing and the Court went on to explain that "it was as if the trial judge had instructed a jury to disregard the mitigating evidence." (*Eddings*, 455 U.S. at 114, 71 L. Ed. 2d at

11, 102 S. Ct. at 877.) In a later case, the Court commented upon the rational of *Eddings*:

"Underlying *** *Eddings* is the principle that punishment should be directly related to the personal culpability of the criminal defendant. If the sentencer is to make an individualized assessment of the appropriateness of the death penalty, 'evidence about the defendant's background and character is relevant because of the belief, long held by this society, *that defendants who commit criminal acts that are attributable to a disadvantaged background, or to emotional and mental problems, may be less culpable than defendants who have no such excuse.' California v. Brown,* 479 U.S. 538, 545 [93 L. Ed. 2d 934, 942, 107 S. Ct. 837, 841] (1987) (O'Connor, J., concurring). Moreover, *Eddings* makes clear that it is not enough simply to allow the defendant to present mitigating evidence to the sentencer. The sentencer must also be able to consider and give effect to that evidence in imposing sentence." (Emphasis added.) *Penry v. Lynaugh* (1989), 492 U.S. 302, 319, 106 L. Ed. 2d 256, 278, 109 S. Ct. 2934, 2947.

Attorneys are given considerable leeway in making their closing rebuttal arguments. The trial court is responsible for overseeing the character and scope of argument and " 'every reasonable presumption must be indulged in that the trial judge *** properly. exercised the discretion vested in him.' " (*People v. Morgan* (1986), 112 Ill. 2d 111, 131, quoting *People v. Smothers* (1973), 55 Ill. 2d 172, 176.) The trial judge allowed the State to make the remark over defendant's objection. On the one hand, the complained-of remark seems to inform the jury that it was not to consider what caused defendant to commit murder. That line of argument would have been improper because, as *Penry* tells us, when defendants maintain that their criminal conduct stems from their disadvantaged backgrounds, that fact must be considered in mitigation. But, this court finds that the prosecution's remark was invited by defense counsel.

"Where defense counsel provokes a response, defendant cannot complain that the State's reply denied him a fair trial." (*People v. Lyles* (1985), 106 Ill. 2d 373, 390.) Turning to the instant case, defense counsel argued that the mother of the defendant was a drug user; that the mother should be on trial, instead of the defendant, because she did not provide a proper home; that drugs are now widespread in our society; that violence is spreading also; and that prison terms and death are "not the answer"; and near the end of her argument, defense counsel appealed to the jury as follows:

> "[Defense attorney]: There is a talent there, there is something there to save, and I am asking you to open up your hearts and to *treat the causes*, or there will be many Irving Rameys, they will come just like the drugs have spread in our community." (Emphasis added.)

The second remark which defendant complains of is as follows:

> "MR. SIMMONS [Assistant State's Attorney]: Ladies and Gentlemen of the Jury, let's get something straight right from the start, and that is this.
>
> There is no requirement at all that the People of the State of Illinois show you and put on evidence of any further aggravating factors but for what this convicted murderer did in the murder of Derrick Quincy Wilkinson.
>
> We don't have to.
>
> What I suggest to you is this. What I argue to you very strongly is this, those acts, themselves, are sufficient for this Defendant to be sentenced to death, so when there is talk about Constitutional rights, there are no Constitutional rights, and you will not be instructed as to any Constitutional rights that he has a trial in any pending murder or any pending residential burglary.
>
> MR. FLETCHER [Defense attorney]: Objection, that is not the case.
>
> THE COURT: Overruled.
>
> MR. SIMMONS: I will repeat myself, again, I will not read any instructions to you in this aggravation hearing

that he is entitled to a trial on either the pending murder or the pending residential burglary.

MR. GOLDBERG: Objection, that is totally misleading.

THE COURT: Overruled.

MR. SIMMONS: ***

If it's relevant, and if it's reliable, you are supposed to hear it ***."

As was said earlier in this opinion, defense counsel cannot complain of remarks made by the prosecution when the remarks were invited by the defense. The prosecutor was responding to defense counsel's misstatement of the law relative to the admission of evidence which concerned defendant's prior criminal activity. See *Lyles*, 106 Ill. 2d at 390-91 (prosecutor argued defense attorney tried to confuse jury after defense counsel incorrectly stated the law relative to the State's burden of proof).

In the instant case, defense counsel made the following argument:

"MS. McGAUGHEY [Defense attorney]: Good Morning.

Yesterday, for the very first time at the sentencing hearing, *** you *** heard for the very first time that Irving Ramey was charged with a residential burglary that occurred in Hazel Crest.

He has not had a trial on that matter.

* * *

MS. McGAUGHEY: I am *** asking you to set aside, for the moment, the residential burglary, give him this opportunity to exercise his Constitutional rights."

Defense counsel erroneously argued that her client was entitled to a trial before evidence of other criminal conduct could be admitted at sentencing. This argument was an incorrect statement of the law. See *People v. La Pointe* (1981), 88 Ill. 2d 482, 498 ("Whether a defendant had been prosecuted and convicted for other misconduct, proof of which is offered at a sentencing hearing, is not, in our judgment, controlling as to its admissibility.

More important are the questions of relevancy and accuracy of the information submitted").

Defendant next complains of the following remarks made by the prosecutor:

> "[Assistant State's Attorney]: We ask you, when you follow the law, do that weighing process where we submit to you that once the scales of justice come out and you weigh all the aggravating factors, \*\*\* it won't be close.
>
> We ask you, Ladies and Gentlemen of the Jury, to sentence the Defendant, Irving Ramey to death.
>
> We ask you, Ladies and Gentlemen of the Jury, to sentence this convicted murderer to death very quickly.
>
> MR. GOLDBERG: Objection, very quickly.
>
> THE COURT: Overruled.
>
> MR. SIMMONS: Do it as quick as you can, \*\*\* do it as quickly as he planned the murder and home invasion of the Quincy residence, that is what we are asking you to do, give him the swift justice that he deserves \*\*\*."

Defendant argues that the prosecutor improperly diverted the jury's attention away from its responsibility as the weigher of aggravating and mitigating circumstances. The State maintains that because the evidence supporting the death penalty was so strong, it had a right to ask the jury to return a quick verdict.

In *People v. Gacy* (1984), 103 Ill. 2d 1, a prosecutor argued that if the jury did not sentence the defendant to death, it would have made a mockery of the concept of justice because the law of Illinois would have been ignored. The defendant there contended that the remark was such that the jury would not adhere to its responsibility to weigh the evidence. The court found no error in the remarks, concluding that the State "was merely arguing that the People had proved their case, and were entitled to a decision in their favor." (*Gacy*, 103 Ill. 2d at 97-98.) Similarly, the State here argued that its case was strong and urged the jury to deliberate quickly.

Defendant next contends that his right to a reliable sentencing hearing was denied when the State introduced into evidence an unadjudicated residential burglary. The State maintains that the evidence regarding the burglary was both relevant and reliable.

> "The evidentiary rules applicable to a determination of guilt differ from those applicable at sentencing. When considering aggravating and mitigating factors pursuant to section 9—1(c) \*\*\* (Ill. Rev. Stat. 1983, ch. 38, par. 9—1(c)), a sentencing judge may consider all relevant and reliable testimony. [Citation.] Moreover, we have specifically held that testimony involving misconduct not resulting in prosecution may be reliable and relevant to sentencing. [Citation.] Further, the evaluation of testimony's relevance and reliability is left largely to the sentencing judge's discretion." (*People v. Richardson* (1988), 123 Ill. 2d 322, 361-62.)

Under the relaxed standard outlined above, hearsay evidence of unadjudicated crimes can be admissible also. (*Young*, 128 Ill. 2d at 54.) After reviewing the evidence pertaining to the residential burglary, we find that the judge did not abuse his discretion.

Other than arguing that hearsay was admitted and that there were no eyewitnesses to the burglary, defendant, in a conclusory manner, contends that the evidence "lacked the indicia of reliability required." The key piece of evidence linking defendant with the burglary was supplied through the testimony of an evidence technician. The technician testified as follows: he investigated the crime scene and removed a handwritten note from the inside of the front door to the premises; he recognized the note at sentencing as the note he had taken from the door; he sprayed the note for fingerprints and sent it to the crime lab; he later received a lab report and a photograph of the note (he identified a photograph at sentencing as the photo he had received from the lab); and on the photo, a forensic

scientist had indicated that he identified defendant's prints on the note.

## CONSTITUTIONALITY OF THE DEATH PENALTY

Lastly, defendant contends that the cumulative effect of various aspects of the Illinois death penalty statute render the statute unconstitutional. The State maintains that defendant's arguments have been rejected in prior decisions of this court.

This court has previously rejected defendant's argument and we see no reason to disturb those decisions.

> " 'While this court is cognizant of that old adage that the whole is greater than the sum of its parts, we fail to see how such an adage could be of assistance in such a case as this. If all of the individual aspects are constitutional, we stand by the conclusion that the whole is also constitutional.' " *People v. Gosier* (1991), 145 Ill. 2d 127, 165, quoting *People v. Phillips* (1989), 127 Ill. 2d 499, 542-43.

## CONCLUSION

For the above reasons, defendant's death sentence is vacated and his convictions and nondeath sentences are affirmed. For the reasons expressed earlier in this opinion, the cause is remanded to the circuit court of Cook County for a new sentencing hearing.

*Death sentence vacated;*
*convictions and nondeath*
*sentences affirmed.*

JUSTICE HEIPLE, concurring in part and dissenting in part:

I dissent from that portion of the majority opinion which concludes that the defendant's death sentence must be vacated. The majority concludes that the instructions given to the jury at the first stage of the sentencing hear-

ing were deficient and thus erroneous since the jury was not instructed as to the defendant's intent.

Although language regarding the defendant's intent was not given at the sentencing hearing, such error was harmless for two reasons. First, because it is obvious from the record that the defendant intended to kill the victim, whom he stabbed in the chest and robbed. Second, because the sentencing jury had been fully instructed as to the defendant's intent at the trial itself. At trial, the same jury returned a general verdict finding the defendant guilty of murder. Such a general verdict raises the presumption that the finding of the jury was that the defendant intentionally murdered the victim. *People v. Thompkins* (1988), 121 Ill. 2d 401, 456.

Based on the foregoing, it is not possible that, at the sentencing stage, the jury could have been misled by the instructions into finding defendant eligible for the death penalty without believing that defendant killed the victim with the requisite intent or culpable mental state. Accordingly, any error in the eligibility instructions was harmless. *People v. Jones* (1979), 81 Ill. 2d 1, 10.

Accordingly, I respectfully dissent.

CHIEF JUSTICE MILLER joins in this partial concurrence and partial dissent.