NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2021 IL App (4th) 190794-U

NO. 4-19-0794

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
September 7, 2021
Carla Bender
4ᵗʰ District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Sangamon County |
| SAMUEL ROSARIO, | ) | No. 17CF217 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | John M. Madonia, |
| | ) | Judge Presiding. |

JUSTICE DeARMOND delivered the judgment of the court.
Justices Holder White and Steigmann concurred in the judgment.

**ORDER**

¶ 1    *Held*:   The appellate court granted the Office of the State Appellate Defender's motion to
withdraw as appellate counsel and affirmed the trial court's judgment as no
meritorious issues could be raised on appeal.

¶ 2    Defendant, Samuel Rosario, a Springfield police officer, appeals from the trial

court's dismissal of his motion for a new trial. On appeal, the Office of the State Appellate

Defender (OSAD) moves to withdraw as appellate counsel, asserting no meritorious issues can

be raised on appeal. Defendant was given notice of OSAD's motion and an opportunity to

respond and has not filed a response to OSAD's motion. For the following reasons, we grant

OSAD's motion and affirm the trial court's judgment.

¶ 3                                I. BACKGROUND

¶ 4                              A. The State's Charges

¶ 5        In March 2017, the State charged defendant by information with one count of official misconduct (720 ILCS 5/33-3(b) (West 2016)) and two counts of battery (720 ILCS 5/12-3(a)(1), (2) (West 2016)).

¶ 6                                B. Jury Trial

¶ 7        In August 2019, the matter proceeded to a jury trial. During jury selection, the trial court informed the prospective jurors of each of the legal principles contained in Illinois Supreme Court Rule 431(b) (eff. July 1, 2012), also known as the *Zehr* admonishments (see *People v. Zehr*, 103 Ill. 2d 472, 469 N.E.2d 1062 (1984)), while discussing the nature of the case, the parties and procedures involved in a jury trial, and general principles of law. After being sworn to answer questions, the jurors were asked about their knowledge of the parties or the case, prior jury service, and any reasons why they could not serve fairly and impartially. The prospective jurors were then asked individually whether they understood and accepted each of the four *Zehr* principles as they were recited one-by-one. Each prospective juror responded affirmatively. The defense did not object to the giving of the fourth principle informing jurors a defendant's election not to testify could not be used against him. Because of the unique nature of the case involving a police officer as the defendant, the court inquired, without objection, about possible biases of the jurors in that regard. The court gave the State and defendant the opportunity to question the potential jurors about any bias as well. Both the State and defendant exercised peremptory challenges and challenges for cause before deciding on the final jury, and no juror upon whom the defense expressed reservations served on defendant's jury.

¶ 8        At trial, Springfield police officer Orlando Manzanares testified he and defendant responded to "a criminal damage report" on February 27, 2017, at 2127 East Stewart Street in Springfield, Illinois. Defendant was the first officer to arrive. When Manzanares arrived at the

scene, he observed defendant "in the front of the house speaking with several other subjects out front." Manzanares testified he asked defendant how he could assist, and defendant instructed Manzanares to "go look for the suspect for the call." Upon returning to the residence, Manzanares "saw two males out front, and it appeared that they were clenched together." Manzanares recognized one of the males as defendant and "jumped out of [his] patrol vehicle and started running up to assist [defendant]." As he approached, Manzanares recalled defendant "stating something along the lines of he got it." Manzanares then "disengaged *** and stood by until [he] could step in for assistance." Manzanares further testified defendant and the other male, later identified as Robert Humes II, "ended up on the ground," at which point Manzanares "observed [defendant] strike Mr. Humes several times." While these events were occurring, Manzanares's body camera was on and operating. Manzanares identified the video footage as People's Exhibit No. 1 and stated the footage truly and accurately depicted the images of what he observed that day.

¶ 9        Earlene Humes testified she lived at 2127 East Stewart Street and had eight children, one of whom was Humes II. Humes testified she called the police on February 27, 2017, after one of her daughters "broke a glass table that was no longer in use." When defendant arrived at the scene, he began asking Humes questions before getting into an argument with Humes II, who was "scraping up the glass and stuff." According to Humes, defendant struck Humes II "more than ten times" after defendant "kept making threats to [her] son saying, son, you don't want these hands." Humes II "never touched the officer at all." Humes further testified that after Manzanares arrived, defendant "kept hitting [Humes II] randomly for no apparent reason" before "everything was closed out." Humes II "was never arrested."

¶ 10    The parties stipulated to the qualifications of Dr. Sandhya Kurian to testify as "an expert in the field of medicine." On March 3, 2017, Dr. Kurian treated Humes II while "working at Urgent Care for Memorial Hospital" in Springfield, Illinois. Dr. Kurian testified Humes II "came in with complaints of *** neck pain, upper back pain[,] and lower back pain." Humes II informed Dr. Kurian "that a police officer had assaulted him a few days prior to his arrival at the Urgent Care." Although Dr. Kurian did not observe any "swelling or bruising," she testified Humes II's symptoms were consistent with the manner of injury he reported. Dr. Kurian explained Humes II "needed to have a CT scan" and "before his departure to the emergency room, [she] put a neck collar around his neck *** to stabilize the cervical spine," not based upon any medical observations, but upon the subjective complaints of the patient.

¶ 11    Wendall Banks testified he was the deputy chief of investigations with the Springfield Police Department (SPD) and previously held the positions of sergeant, detective, and patrol officer. As part of their duties, Banks stated patrol officers were authorized to perform official functions, such as responding to calls and making arrests. With regard to training, Banks explained new recruits were sent to "a state certified academy," before returning to SPD's academy, where they spend several weeks "going over our general orders, rules, [and] regulations." SPD's rules and regulations govern the conduct of a police officer. Banks further explained recruits and officers are "constantly critiqued and taught when they can and can't use force" and are expected to know the elements of most crimes they may encounter in the field, including battery, upon completion of their training.

¶ 12    Luke Satterlee, a master sergeant with the Illinois State Police, testified he received an assignment to investigate the incident on February 27, 2017, involving defendant and Humes II. Over the course of the investigation, Satterlee testified he photographed Humes II,

who "had injuries on or about his face." Satterlee identified the photographs as People's Exhibit Nos. 6A through 6D. Satterlee also collected "radio traffic, *** body worn camera footage[,] as well as any radio call logs or dispatch tickets that were submitted by SPD." Satterlee recalled defendant "being the primary officer assigned to the call" and testified defendant "closed the call with *** no contact made."

¶ 13        The State then called James Wolf, an investigator with the Illinois State Police, as an expert in the field of law enforcement use of force. Over the course of his career, Wolf testified he had investigated three shootings involving officers and conducted "additional reviews of use of force thousands of times." In addition, Wolf instructed recruits at the Illinois State Police Academy in control and arrest tactics, which Wolf explained, "would be used to take control of subjects or defend themselves against attacks or tactics to put people under arrest." Wolf also taught "a variety of classes including traffic stops, use of force, [and] domestic violence."

¶ 14        As part of his investigation, Wolf testified he reviewed SPD's policy regarding the use of force, body camera video footage of the incident, and defendant's training file. Wolf explained defendant would have received training in the use of force, which consisted of "a classroom setting where [defendant] would be provided information about use of force. And then *** scenario[-]based training as well as other classes they may touch on as well, control and arrest tactics being one of them." The State then presented Wolf with People's Exhibit No. 5, which Wolf identified as SPD's general order regarding the use of force. Wolf testified types of permissible force included verbal directions and "soft empty hand control pressure points *** against passive resistors." The order also permitted hard empty hand controls, such as strikes,

punches, and kicks, "against persons showing active aggression against an officer by use of punches, kicks, [and] biting."

¶ 15 The State then played portions of People's Exhibit No. 1 for the jury and asked Wolf to describe his conclusions regarding whether defendant's conduct conformed with SPD's policy on the use of force. After viewing People's Exhibit No. 1, Wolf stated defendant's taking of Humes II to the ground and the numerous "[h]ard arm" strikes against Humes II were not in compliance with SPD's policy.

¶ 16 At the close of the State's evidence, defendant moved for a directed verdict, which the trial court denied. Defendant did not call any witnesses or offer any other evidence.

¶ 17 C. Jury Instructions and Verdict

¶ 18 During the jury instructions conference, the State offered multiple pattern jury instructions without objection, including the instructions for the elements and issues for battery (Illinois Pattern Jury Instructions, Criminal, Nos. 11.05 and 11.06 (approved Dec. 8, 2011)) and official misconduct (Illinois Pattern Jury Instructions, Criminal, Nos. 21.15 and 21.16 (approved Dec. 8, 2011)). The jury found defendant guilty of both offenses.

¶ 19 D. Posttrial Proceedings

¶ 20 In September 2019, defendant filed a motion for a new trial, arguing, *inter alia*, "the State failed to prove him guilty beyond a reasonable doubt." At the November 2019 sentencing hearing, the trial court denied defendant's posttrial motion and ultimately sentenced him to 24 months' probation.

¶ 21 This appeal followed. OSAD, appointed counsel for defendant on appeal, filed a motion for leave to withdraw as defendant's counsel and attached a supporting memorandum of law citing *Anders v. California*, 386 U.S. 738 (1967), and *People v. Jones*, 38 Ill. 2d 384, 231

N.E.2d 390 (1967). This court granted defendant leave to file additional points and authorities on or before April 5, 2021. None have been filed.

¶ 22                                   II. ANALYSIS

¶ 23        On appeal, OSAD asserts no colorable argument can be made (1) the State failed to prove defendant guilty beyond a reasonable doubt, (2) the trial court erred in selecting or instructing the jury, (3) defendant was denied the effective assistance of his trial counsel, and (4) the court imposed an excessive sentence. We agree.

¶ 24        The United States Supreme Court has set forth the procedures to be followed for an appellate attorney to withdraw as counsel. *People v. Mares*, 2018 IL App (2d) 150565, ¶ 6, 98 N.E.3d 554. Counsel's request to withdraw must be accompanied by a brief referring to anything in the record that could support an appeal. *People v. Meeks*, 2016 IL App (2d) 140509, ¶ 10, 51 N.E.3d 1109. After identifying issues counsel could conceivably raise, counsel must then explain why these potential arguments are without merit. *Meeks*, 2016 IL App (2d) 140509, ¶ 10. A copy of this motion must be provided to the client, who will then be given an opportunity to respond to the motion to withdraw. *Meeks*, 2016 IL App (2d) 140509, ¶ 10. The appellate court will then review the record to determine whether the available arguments are wholly without merit. *Meeks*, 2016 IL App (2d) 140509, ¶ 10.

¶ 25                           A. Sufficiency of the Evidence

¶ 26        A defendant may only be convicted upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged. *In re Winship*, 397 U.S. 358, 364 (1970). When determining the sufficiency of the evidence supporting a conviction, "our function is not to retry the defendant." *People v. Sutherland*, 223 Ill. 2d 187, 242, 860 N.E.2d 178, 217 (2006). Instead, we must resolve " 'whether, after viewing the evidence in the light

most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " (Emphasis in original.) *People v. Collins*, 106 Ill. 2d 237, 261, 478 N.E.2d 267, 277 (1985) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). We allow all reasonable inferences in the light most favorable to the State. *People v. Beauchamp*, 241 Ill. 2d 1, 8, 944 N.E.2d 319, 323 (2011). It is the province of the finder of fact to determine the credibility of a witness, and the finding is entitled to great weight. *People v. Smith*, 185 Ill. 2d 532, 542, 708 N.E.2d 365, 370 (1999). We reverse only where the evidence is so unsatisfactory, unreasonable, or improbable that it raises a reasonable doubt as to the defendant's guilt. *People v. Evans*, 209 Ill. 2d 194, 209, 808 N.E.2d 939, 947 (2004).

¶ 27        Here, defendant was charged with both battery and official misconduct. "A person commits battery if he or she knowingly without legal justification by any means (1) causes bodily harm to an individual or (2) makes physical contact of an insulting or provoking nature with an individual." 720 ILCS 5/12-3(a) (West 2016). Additionally, as charged in this case, "[a] public officer or employee or special government agent commits misconduct when, in his official capacity or capacity as a special government agent, he *** [k]nowingly performs an act which he knows he is forbidden by law to perform." 720 ILCS 5/33-3(a)(2) (West 2016).

¶ 28        In this case, Deputy Chief Banks testified new recruits spend several weeks "going over [SPD's] general orders, rules, [and] regulations." He further explained recruits are "constantly critiqued and taught when they can and can't use force," and defendant would have been expected to know the elements of most crimes he might encounter in the field, including battery, upon completion of his training. Humes testified she called the police on February 27, 2017, and when defendant arrived, he began asking her questions before getting into an argument with Humes II. According to Humes, defendant struck Humes II "more than ten times" after

defendant "kept making threats to [Humes II] saying, son, you don't want these hands." Officer Manzanares testified he also responded to the "criminal damage report" at Humes's residence on February 27, 2017. After searching for the suspect of the call, Manzanares returned to the residence where he observed defendant and Humes II "clenched together." Defendant and Humes II eventually "ended up on the ground," where Manzanares "observed [defendant] strike Mr. Humes several times." Manzanares's body camera recorded these events as they occurred. The State played the video footage for the jury, and it accurately depicted the events to which Manzanares attested.

¶ 29 The State also called Investigator Wolf as an expert in the field of law enforcement use of force. After reviewing SPD's general order on the use of force and Manzanares's body camera footage, Wolf opined defendant's taking of Humes II to the ground and the numerous "[h]ard arm" strikes against Humes II were not in compliance with SPD's policy. Further, Satterlee testified he photographed the "injuries on or about [Humes II's] face," the photographs of which the State introduced as People's Exhibit Nos. 6A to 6D. Dr. Kurian testified Humes II informed her on March 3, 2017, "that a police officer had assaulted him a few days prior," and his complaints of "neck pain, upper back pain[,] and lower back pain" were consistent with the manner of injury he reported. Based on this record, the evidence against defendant was overwhelming, and we agree with OSAD any argument the State failed to prove the elements of the crimes charged beyond a reasonable doubt would be without merit.

¶ 30                                 B. Jury Selection and Instruction

¶ 31 "The constitutional right to a jury trial guarantees to a criminal defendant a fair trial by an impartial jury, and the failure to provide a criminal defendant a fair trial violates the minimal standards of due process." *People v. Stremmel*, 258 Ill. App. 3d 93, 112-13, 630 N.E.2d

1301, 1314 (1994) (citing *Turner v. Louisiana*, 379 U.S. 466, 471-72 (1965)). The purpose of *voir dire* is to secure an impartial jury. *People v. Peeples*, 155 Ill. 2d 422, 462, 616 N.E.2d 294, 313 (1993). Impartiality is a state of mind, and a potential juror's "state of mind must be ascertained from statements made by the venireperson, given the weight to which they are entitled under the circumstances." *Peeples*, 155 Ill. 2d at 462. During *voir dire*, the trial court asks potential jurors questions it finds appropriate to ascertain the potential jurors' qualifications to serve on the jury. Ill. S. Ct. R. 431(a) (eff. July 1, 2012). In addition, the trial court must ask all potential jurors if they understand and accept the following principles: "(1) that the defendant is presumed innocent of the charge(s) against him or her; (2) that before a defendant can be convicted the State must prove the defendant guilty beyond a reasonable doubt; (3) that the defendant is not required to offer any evidence on his or her own behalf; and (4) that if a defendant does not testify it cannot be held against him or her." Ill. S. Ct. R. 431(b) (eff. July 1, 2012).

¶ 32        Here, the trial court asked the potential jurors a variety of questions about whether they knew the parties, knew about the case, and their past jury service. The court read the *Zehr* principles to the potential jurors, and each person answered "yes" when the court asked individually whether they understood and accepted the principles. The court also gave the State and defendant the opportunity to question the potential jurors about any bias. The jurors were properly advised of the *Zehr* principles, and both the State and defendant exercised peremptory challenges and challenges for cause before deciding on the final jury. Accordingly, we agree with OSAD there is no non-frivolous basis to argue defendant's jury was not impartial.

¶ 33        OSAD also considered raising an issue as to whether the jury was properly instructed. A defendant is denied his constitutional right to a fair trial if the jury is not properly

instructed. *People v. Valadovinos*, 2014 IL App (1st) 130076, ¶ 23, 22 N.E.3d 114. " 'The sole function of instructions is to convey to the minds of the jury the correct principles of law applicable to the evidence submitted to it in order that *** the jury may, by the application of proper legal principles, arrive at a correct conclusion according to the law and the evidence.' " *People v. Ramey*, 151 Ill. 2d 498, 535, 603 N.E.2d 519, 534 (1992) (quoting *People v. Gambony*, 402 Ill. 74, 81-82, 83 N.E.2d 321, 325 (1948)). Jury instructions must plainly set forth the applicable law and must not be misleading or confusing. *Valadovinos*, 2014 IL App (1st) 130076, ¶ 23. The trial court is required to use the most recent version of the Illinois Pattern Jury Instructions, Criminal, when an instruction is applicable to the facts and law of the case. Ill. S. Ct. R. 451(a) (eff. Apr. 8, 2013). We review the decision to give a jury instruction for an abuse of discretion. *People v. Mohr*, 228 Ill. 2d 53, 66, 885 N.E.2d 1019, 1026 (2008).

¶ 34        Here, the State submitted 17 instructions, all of which were pattern jury instructions. The instructions provided the jury with the definitions and elements of official misconduct and battery. Specifically, the instructions informed the jury that, to sustain the charge of official misconduct, it had to find the State proved beyond a reasonable doubt (1) defendant was a public employee and (2) he knowingly performed an act which he knew he was forbidden by law to perform when in his official capacity. To sustain the charge of battery, the instructions informed the jury it had to find the State proved beyond a reasonable doubt defendant knowingly (1) caused bodily harm to or (2) made physical contact of an insulting or provoking nature with Humes II. These instructions accurately stated the elements from the official misconduct and battery statutes, as stated *supra*. See 720 ILCS 5/12-3(a), 33-3(a)(2) (West 2016). Thus, we agree with OSAD no meritorious claim can be raised the trial court abused its discretion in giving the proposed pattern jury instructions where the instructions accurately stated the law.

- 11 -

¶ 35                    C. Ineffective Assistance of Trial Counsel

¶ 36          This court is highly deferential to counsel's performance because there "are

countless ways to provide effective assistance in any given case. Even the best criminal defense

attorneys would not defend a particular client in the same way." *Strickland v. Washington*, 466

U.S. 668, 689 (1984). Further, the defendant must overcome the strong presumption the

challenged action or inaction may have been sound trial strategy. *People v. Sturgeon*, 2019 IL

App (4th) 170035, ¶ 83, 126 N.E.3d 703. "Decisions concerning which witnesses to call at trial

and what evidence to present on defendant's behalf ultimately rest with trial counsel." *People v.

Wilborn*, 2011 IL App (1st) 092802, ¶ 79, 962 N.E.2d 528. "It is well established that these types

of decisions are considered matters of trial strategy and are generally immune from claims of

ineffective assistance of counsel." *Wilborn*, 2011 IL App (1st) 092802, ¶ 79.

¶ 37          "To establish prejudice, a defendant must show that, but for counsel's errors,

there is a reasonable probability that the result of the proceeding would have been different."

*Sturgeon*, 2019 IL App (4th) 170035, ¶ 84. "[A] reasonable probability that the result would have

been different is a probability sufficient to undermine confidence in the outcome—or put another

way, that counsel's deficient performance rendered the result of the trial unreliable or

fundamentally unfair." *Evans*, 209 Ill. 2d at 220.

¶ 38          "We review a defendant's claim of ineffective assistance of counsel in a

bifurcated fashion, deferring to the trial court's findings of fact unless they are contrary to the

manifest weight of the evidence, but assessing *de novo* the ultimate legal question of whether

counsel was ineffective." *People v. Manoharan*, 394 Ill. App. 3d 762, 769, 916 N.E.2d 134, 141

(2009). In resolving issues related to counsel's performance, reviewing courts must consider the

totality of counsel's conduct, not just an isolated incident. *People v. Hamilton*, 361 Ill. App. 3d 836, 847, 838 N.E.2d 160, 170 (2005).

¶ 39 Here, defendant cannot satisfy the first prong, as defendant cannot show his trial counsel committed any particular trial errors. There is nothing in this record supporting any allegation of ineffective assistance of counsel. The record reveals trial counsel zealously advocated for defendant at all stages of the proceedings and, as OSAD points out, "[i]f counsel committed any errors giving rise to an ineffective assistance claim, they do not appear in the record." Consequently, we agree with OSAD there is no colorable argument defendant was deprived the effective assistance of his trial counsel.

¶ 40                                    D. Excessive Sentence

¶ 41 "A sentence within statutory limits will not be deemed excessive unless it is greatly at variance with the spirit and purpose of the law or manifestly disproportionate to the nature of the offense." (Internal quotation marks omitted.) *People v. Little*, 2011 IL App (4th) 090787, ¶ 22, 957 N.E.2d 102. The trial court has discretion when sentencing, and we will not reverse the court's decision absent an abuse of that discretion. *People v. Snyder*, 2011 IL 111382, ¶ 36, 959 N.E.2d 656.

¶ 42 Here, defendant was convicted of a Class 3 felony, which carries a range of penalties from 2 to 5 years in prison, up to 18 months' periodic imprisonment, and the possibility of probation or conditional discharge of up to 30 months. See 720 ILCS 5/33-3(c) (West 2016); 730 ILCS 5/5-4.5-40(a), (b), (d) (West 2016). "A sentence within the statutory guidelines is presumed proper." *People v. Wilson*, 2016 IL App (1st) 141063, ¶ 12, 65 N.E.3d 419. Because defendant's sentence to 24 months' probation falls within the permissible sentencing range, it is

presumed to be proper, and nothing in the record defeats this presumption. Thus, any argument the court abused its discretion in sentencing defendant would be without arguable merit.

¶ 43                                    III. CONCLUSION

¶ 44          For the reasons stated, we grant OSAD's motion for leave to withdraw as appellate counsel and affirm the trial court's judgment.

¶ 45          Affirmed.