NOTICE
Decision filed 07/05/23. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2023 IL App (5th) 200073-U

NO. 5-20-0073

IN THE

NOTICE
This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | St. Clair County. |
| | ) | |
| v. | ) | No. 16-CF-1525 |
| | ) | |
| JUNE HAMILTON DEAN, | ) | Honorable |
| | ) | John J. O'Gara, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE VAUGHAN delivered the judgment of the court.
Presiding Justice Boie and Justice Moore concurred in the judgment.

**ORDER**

¶ 1    *Held*: Evidence was sufficient to convict defendant of forgery and public contractor misconduct. The jury instructions for the public contractor misconduct charge were proper and defendant forfeited the remaining issues on appeal.

¶ 2    Defendant appeals her convictions and sentences for forgery (720 ILCS 5/17-3(a)(1) (West 2016)) and public contractor misconduct (*id.* § 33-7(a)(2)). She asserts an insufficient evidence claim and error in the instructions, closing arguments, and sentence. For the following reasons, we affirm.

¶ 3                                    I. BACKGROUND

¶ 4    On December 30, 2016, a grand jury indicted defendant, June Hamilton Dean, on two counts. The first count charged defendant with forgery in violation of section 17-3(a)(1) of the Criminal Code of 2012 (720 ILCS 5/17-3(a)(1) (West 2016)), in that she, "with the intent to

1

defraud, knowingly made a false document ***, being a letter stating the employment status of RaeShaunta Lacy, a document apparently capable of defrauding another." The second count charged her with public contractor misconduct (*id.* § 33-7(a)(2)), in that defendant, a public contractor with the East St. Louis Township (Township) as a financial consultant, knowingly performed an act while in performance of a contract with the Township "which she knew was forbidden by law to perform, in that she committed a forgery."

¶ 5	The parties submitted a stipulation, which averred the State retrieved three documents from a computer owned by the Township and used by defendant in her professional capacity as a consultant for the Township. The first document—admitted as State's exhibit 2—was a Microsoft word document titled "Employments Verification," which was a letter on the Township letterhead. The document was created on February 7, 2016, at 3:56 p.m. and last modified on March 8, 2016, at 9:22 a.m. The letter was dated March 8, 2016. The second document—admitted as State's exhibit 3—was an Adobe PDF file titled "Employment Verification." It was created and last modified on March 8, 2016, at 9:22 a.m.

¶ 6	The contents of State's exhibits 2 and 3 were substantively the same. The letters were addressed to Alexa McDonald at McDonald Mobile Home Rental (McDonald) in Swansea, Illinois, and averred Lacy had been hired as a "full time Senior Services Specialist, East Saint Louis Township, effective March 16, 2016." The letters also indicated Lacy would make $34,000 per year. It provided contact information if the recipient needed further information. "Sincerely" was at the bottom of both letters with a signature block for Yvette Johnson, but there was no signature. It listed Yvette's title as "Program Director." Both letters were found in the "JustJune2" folder on defendant's work computer.

¶ 7    The third document—admitted as State exhibit 4—was an e-mail sent on March 8, 2016, at 3:29 p.m. from defendant's personal e-mail account to the Township's e-mail account. The subject line was "Employment Verification," and the PDF titled "Employment Verification" (State's exhibit No. 3) was attached to e-mail. The e-mail provided McDonald's telephone number and requested the recipient call McDonald and ask whether the employment verification should be e-mailed or faxed.

¶ 8    During opening statements, defense counsel provided the defense's theory of the case, stating that defendant had the authority to hire Lacy. He averred that the evidence would show "two different types of funding and two different types of employment that occur within the township." He further stated EarnFare programs provide funds to certain employees for housing and other basic needs. While a full-time employee under this program requires the Township board's approval, employees for the probationary period were under the discretion of defendant. So, defendant here had the authority to use the EarnFare funds to create the position held by Lacy. Counsel further stated there was no representation that Lacy was a current full-time employee; the only representation was that Lacy anticipated future employment.

¶ 9    Alexa Edwards, owner of McDonald, testified that her employment duties encompass "just about anything that needs done." As part of her duties, it was her responsibility to keep records, and she kept a file for every tenant. For renters, the file contained the tenant's application, credit report, copy of the tenant's driver's license, and a verification of employment or verification of income. Edwards testified that Lacy rented from McDonald in March 2016.

¶ 10    After being shown State's exhibit 2, Edwards identified the document as Lacy's submitted verification of employment (McDonald letter). She was not sure how the letter made it into Lacy's file at McDonald and admitted it was difficult to remember every document she acquired and every

3

tenant's file given that she was solely responsible for all 74 properties owned by McDonald. She stated that she knew the letter was not faxed because it did not have a facsimile heading at the top of document. Edwards also believed the letter was not mailed, because the letter in her file was flat and did not have fold lines. She averred that the business's e-mail was not backed up and it was possible the letter was e-mailed to her.

¶ 11 When asked whether she made decisions based on a renter's employment and income verification, Edwards replied, "Yes." She explained that it depended on someone's debt-to-credit ratio, but for a $700 rental, she would generally want the renter to make $2000 a month. Edwards further stated that the level of income indicated in Lacy's employment verification letter satisfied McDonald's requirements regarding a tenant's ability to pay. The State asked if Edwards would have rented to Lacy without the employment verification letter, to which she replied, "[Lacy] would have needed to prove some form of payment, that she would have been having income to pay."

¶ 12 Edwards further stated that she would not have accepted the letter as verification if she knew it was untrue. Upon the State asking whether Edwards would rent to someone who would not begin their employment for six months, she stated, "There would have to be proof of income that they would have resources to pay the rent." Edwards stated that the letter provided a number to call and verify the employment, but she never called the number and did not know whose number was provided in the letter.

¶ 13 The State called FBI Special Agent Charles Willenborg to testify. He stated that he was a special agent with the Fairview Heights office of the Springfield Division of the Federal Bureau of Investigation, assigned to work primarily in public corruption. He was first alerted to, and

4

investigated, the Township when a news article alleged misuse of credit cards and financial fraud at the Township.

¶ 14    Agent Willenborg explained that the Township was publicly funded through taxes collected through the state and the funds provided were for general assistance to the community. In 2016, defendant was contracted as a financial consultant for the Township. Her brother was also the supervisor of the Township.

¶ 15    During a financial investigation related to wire fraud, Agent Willenborg obtained a search warrant for the Township's building to look for any evidence related to the Township's finances. Defendant's computer was of interest considering it was a financial investigation and she was the Township's financial consultant. Agent Willenborg did not initially retrieve defendant's laptop because she did not have it with her at that time. Later that night, after the police executed the search warrant and left the Township's building, defendant called Agent Willenborg, offering to bring him her laptop.

¶ 16    After Agent Willenborg received the laptop, the forensic computer examiner made a "read only" copy of the computer's contents. Agent Willenborg reviewed the contents and discovered the documents classified as State's exhibits 2, 3, and 4.

¶ 17    Agent Willenborg averred that State's exhibit 3 was a letter that appeared identical in appearance and form to State's exhibit 2, but he could not distinguish between a Word document and PDF document based on the printout of the documents. When asked the differences between a Word document and a PDF, Agent Willenborg explained that a Word document allowed a person to type up different letters and other text-based documents that were editable. Whereas a PDF was a document that was generally not editable and was similar to an electronic print version of a document.

¶ 18    Based on the documents, Agent Willenborg contacted Alexa Edwards at McDonald. Edwards maintained a file for Lacy, which contained a copy of the employment verification letter that matched State's exhibits 2 and 3. Agent Willenborg admitted there was no information that positively showed how the letter arrived in Lacy's file with McDonald.

¶ 19    Following an interview of Lacy, Agent Willenborg contacted Christone Enterprises Property Management (Christone), who was doing business as White Oaks Apartments, and spoke with Christopher Mendola. After checking his records, Mendola forwarded an e-mail to Agent Willenborg, which contained an employment verification letter on the Township's letterhead for an application submitted on behalf of Lacy. The State submitted the e-mail Mendola sent to Agent Willenborg as the State's exhibit 6. It also submitted the attachment to that e-mail as the State's exhibit 5 (Christone letter). The exhibits were admitted without objection.

¶ 20    Agent Willenborg testified that the e-mail Mendola forwarded to him was originally sent to twyla@christone.com from Oliver Hamilton—using the Township's e-mail—and dated February 8, 2016. The body of the e-mail stated, "Twyla, per our conversation, attached is the employment verification for Ms. Lacy." The e-mail was signed by defendant.

¶ 21    The employment verification letter attached to the e-mail was addressed to Christone Enterprises, Inc., in O'Fallon, IL. The letter, dated February 5, 2016, stated that Lacy had been hired full-time as a senior services specialist at the Clyde C. Jordan Senior Citizens Center of East St. Louis, Illinois, effective March 7, 2016, with an annual salary of $36,000. It contained a contact number if Christone needed any additional information. Defendant's signature was at the bottom of the letter with her title listed as "Fiscal Officer/Human Resources." Upon questioning from the State, Agent Willenborg explained the Word document (State's exhibit No. 2) had an origin date of February 7, 2016.

6

¶ 22   Throughout his investigation, Agent Willenborg reviewed many documents and electronic files from the Township. He did not locate any information that Lacy was a full-time employee. However, there "was an indication that [Lacy] participated in [the Township's] EarnFare program at some point in time." As Agent Willenborg understood, EarnFare was a state funded program in which individuals who received SNAP benefits could work and gain job skills and receive cash in addition to their SNAP or Link benefits. Participation in EarnFare, however, was not full-time employment. Agent Willenborg believed an EarnFare worker was limited to making $300 a month at the relevant time.

¶ 23   On cross-examination, Agent Willenborg stated that there was no evidence that defendant deleted anything off of her work computer during the six-hour period between the search of the Township building and when defendant provided the computer to Agent Willenborg. He averred that he informed defendant it would possibly be an additional crime if she tampered with the computer. He admitted that more than one individual had access to the Township's e-mail account and because it was a "cloud based e-mail address, it would be difficult to state who had access to it."

¶ 24   Defense counsel asked if it could be logically inferred that State's exhibit 2—the Word document version of the McDonald letter—was a work in progress, considering there was no electronic signature on that document but State's exhibit 5—the Christone letter—had an electronic signature despite being created a month prior. Agent Willenborg replied that his logical inference from those facts was that the person who drafted the document did not yet have access to Yvette Johnson's electronic signature. Agent Willenborg admitted he did not know what the Township was able to do electronically, but he did not view the Word document as a working document since it had already been saved as a PDF.

7

¶ 25    The State next called Christopher Mendola, the president of Christone. He explained that Christone was a residential rental business with approximately 1200 rental properties primarily located in the St. Clair County, Illinois, area. Potential tenants were required to fill out an application. Christone would then run a credit check, copy the person's driver's license, and verify employment and income. Mendola stated that typically, a potential tenant's gross income must be four times the monthly rent. He further averred that income was often verified by submission of the potential tenant's paycheck stubs or previous years' tax returns, but if the potential tenant moved from out of the state, he would require paycheck stubs from the former employer and a proof of employment letter from the current or future employer.

¶ 26    Mendola testified that in March or April of 2016, Lacy submitted an application and Christone approved it. During the application process, Lacy submitted paycheck stubs from her previous employer in California and an employment verification letter. Mendola identified State's exhibit 5 as a copy of the employment verification letter for Lacy that he received.

¶ 27    After reviewing State's exhibit 6, Mendola explained that it was a chain of e-mails that he forwarded to Agent Willenborg. Mendola stated the first e-mail—in chronological order—was from defendant to Twyla, the head accountant for Christone, providing Lacy's employment verification. Mendola clarified that defendant signed the e-mail, but the sender of the e-mail was listed as Oliver Hamilton using the Township's e-mail address.

¶ 28    Mendola stated that income was the most important information in a renter's application process. He later averred that he would not have approved Lacy's application if she only submitted her previous paystubs from California with no other verification of employment. Mendola testified that Christone would have not approved Lacy's application if she made less than $2200 in gross income each month and accepted the employment verification letter as true.

8

¶ 29    On cross-examination, Mendola conceded there were other considerations in approving a potential tenant, such as reliability and safety. He acknowledged a phone number was provided in the letter, but he did not need additional information after he received the letter confirming Lacy's employment. Mendola testified that Lacy endorsed the lease but ultimately decided not to become a tenant at Christone.

¶ 30    Yvette Johnson, the business manager for the Township in 2016, also testified. In her position, she oversaw the daily operations, including supervising staff and maintaining records. She also had to attend the monthly Township board meetings. She estimated four other people worked in the Township office at that time: Oliver Hamilton, Sandra Smith, Richard Johnson, and Sherron. Yvette explained that Richard Johnson was her assistant and defendant's son-in-law. Oliver was the Township's supervisor, Sherron directed the EarnFare program, and Sandra was the building's maintenance person.

¶ 31    Yvette described the EarnFare program, explaining that people who needed help to get back on their feet were allowed to work a set number of hours a month and would be paid up to $290 per month. She stated that a participant in the EarnFare program did not work 40 hours a week but could work 40 hours over the course of the month.

¶ 32    Yvette testified that, as business manager, she would use the Township's e-mail. Oliver Hamilton, defendant, and Richard Johnson also had access to the Township's e-mail. There were six computers at the Township building, including the one in Yvette's office.

¶ 33    Yvette testified that because the Township's office was small, she would have noticed if another employee began working there. She further stated the Township ran the Clyde C. Jordan Senior Citizen Center, which was in the same building as the Township's office. Three full-time employees worked at that facility. She averred that if a fourth employee began working at the

9

Clyde C. Jordan Senior Citizen Center, she would have noticed. She was also not aware of any senior services specialist position at the Clyde C. Jordan Senior Citizen Center in 2016.

¶ 34 Yvette knew of Lacy because Lacy was the sister of defendant's boyfriend. Yvette testified that there was no employee file for Lacy. Lacy never received a paycheck, employee benefits, nor a W-2 from the Township. The Township's budget also never included $34,000 or $36,000 for Lacy's position. Yvette averred that she was not aware that Lacy had ever been hired as a full-time employee by the Township.

¶ 35 The State presented the McDonald letter (exhibit No. 2) for Yvette's review. Yvette stated that although her signature block was at the bottom of the letter, she was certain she did not write it. Yvette explained the signature block displayed the title of "program director," a position that Yvette never held and would not have listed as her title. She also stated she did not know Lacy's first name and would not have been able to spell it properly. Yvette testified that she would not have written that Lacy was a full-time employee because she was not one.

¶ 36 On cross-examination, Yvette explained the Township had a board of trustees and full-time office personnel. Under that umbrella, however, there were various other employees who facilitated the variety of Township programs—including the EarnFare program—that helped the community. When asked if all of those who were employed in those various programs needed board approval, Yvette stated, "The only one I'd say that didn't have to would have been the Senior Citizens program." However, Yvette explained the employees of the Senior Citizens program would require approval from the Clyde C. Jordan Senior Citizen Center board. Upon further review of State's exhibit 2, Yvette testified that the phone number in the letter was the Township's phone number.

¶ 37    The State's next witness was Edith Moore Stokes, an elected Township board member for about 12 years and a current board member. She stated the Township's purpose was to "fill the gap," meaning it provided or recommended social services for those who were residents of East St. Louis and met income requirements, which was usually any resident below the poverty line. The Township board set policies for the activities the Township undertook in a given year. It decided—through voting of its five members—budgeting, expenses, and hiring. Stokes clarified the board would vote on full-time hiring decisions before the person began his or her employment. The board usually met once a month. The meeting was public, and minutes were taken.

¶ 38    When asked if the board approved Lacy as a full-time employee, Stokes replied, "Not to my knowledge." Stokes said the senior services specialist position existed, but she did not believe it existed when Lacy was supposedly employed. Stokes knew a man with the last name Lacy, and stated he was defendant's fiancé.

¶ 39    Stokes admitted that she was charged with forgery in 2016 but stated the charge was dismissed because "we worked out something." She was also convicted of an election code violation in 2017 and received conditional discharge.

¶ 40    On cross-examination, defense counsel suggested the State dropped Stokes's felony forgery charge and instead charged her with a misdemeanor election code violation for her cooperation in this case. Stokes replied, "I haven't been given an offer of anything that I'm aware of." Later, defense counsel again posed, "And again, part of the condition of your discharge was the cooperation here at the trial ***?" Stokes replied, "I was not under the impression or the belief that I had to do anything but tell the truth as I knew the truth to be."

11

¶ 41    On redirect, Stokes clarified that she was not under the impression that she had to testify, and the State never asked her to testify in this case. The only thing she had to do was stay out of trouble.

¶ 42    The State rested. Defense counsel moved for a directed verdict, arguing there was no evidence defendant facilitated the McDonald letter to Edwards or drafted the letter with the intent that it be turned in to anyone. Counsel further argued there was no false information in the letter because the evidence showed Lacy was employed by EarnFare, a subprogram of the Township. The letter also indicated a future start date or anticipated employment, so "there could be no argument from the State that someone was defrauding about a past accomplished action that didn't actually occur. It was all about future intent." The court denied the motion, and the defense rested without presenting any evidence.

¶ 43    During the instructions conference, the State offered State's instruction No. 15, which stated:

    "A public contractor commits the offense of public contractor misconduct when, in his official capacity, he knowingly performs an act which he knows he is forbidden by law to perform. Non-Pattern Instruction based upon IPI 21.15 and 720 ILCS 5/33-7(a)(2)."

¶ 44    Defense counsel objected, taking issue with the phrase "performs an act which he knows he is forbidden by law to perform" and argued it should be replaced with "performs the act of forgery." He further argued otherwise, the jury would be misled into thinking they could convict based on anything "that they [could] envision being a crime without holding the State to a burden of proof on the elements of any other speculative offense."

¶ 45    The State contended the instruction, as written, comported with Illinois Pattern Jury Instructions (IPI), Criminal, No. 21.15, which was the pattern instruction for public official

12

misconduct (720 ILCS 5/33-3(a)(2) (West 2016)), and the public official misconduct statute was strikingly similar to the public contractor misconduct statute (*id.* § 33-7(a)(2)). It argued to not follow a comparable instruction stepped on the toes of the instructions committee.

¶ 46    Defense counsel replied that State's instruction No. 15 was not a pattern instruction created by the committee, and accordingly, the nonpattern instruction must not prejudice defendant and ensure the jury is informed of the necessary elements. Counsel contended that the evidence discussing the various townships, subsidiaries, and programs provided "almost infinite opportunity for the jurors to speculate should they be coming up with an offense to try to hold my client accountable *** when no evidence or argument about that offense was made."

¶ 47    The court overruled defense counsel's objection, reasoning that using IPI language from a statute best analogous to the situation at hand was the best they could do. The State then offered State's instruction No. 16, a "non-pattern, based upon IPI 21.16 and 720 ILCS 5/33-7(a)(2)."

¶ 48    State's instruction No. 16 stated:

>       "To sustain the charge of public contractor misconduct, the State must prove the following propositions:
>
>       First Proposition: That the defendant was a public contractor; and
>
>       Second Proposition: That when in his official capacity, the defendant knowingly performed an act which he knew he was forbidden by law to perform."

¶ 49    Defense counsel again objected, incorporating his previous arguments. The court overruled the objection, noting it believed the instruction was a proper recitation of the law and properly set forth the necessary elements to sustain a conviction.

¶ 50    During closing arguments, the State asserted that the evidence showed the letter found on defendant's computer was originally created February 7, 2016, one day before Christone received

a letter from the Township's e-mail address. The same letter was modified and converted into a PDF on March 8, 2016, at 9:22 a.m. Hours later, the Township received an e-mail from defendant's personal account with the PDF version of the letter attached and requested the receiver to "please call McDonald and ask where they would like the employment verification e-mailed or faxed." In explaining the difference between a Word document and a PDF, the State argued:

> "A PDF is like taking a photo of a document. Okay? You can't move the letters around. You can't change the text around. So, when you send a PDF to someone, it is locked, for most cases. You heard that testimony from Special Agent Willenborg. When you get a PDF, you're not going to be able to move that document around. You're not going to be able to add anything additional to it afterwards."

¶ 51   The State argued that defendant had access to the Township's e-mail, and Yvette testified that she never drafted the letters and Lacy was not a Township employee. It further argued that because the evidence showed Lacy was—at most—a part-time EarnFare worker making $300 a month, the letters indicating she made over $30,000 a year were made with the intent to defraud McDonald and Christone.

¶ 52   Defense counsel argued that the case centered around Lacy's applications and the State could have directly asked Lacy about her employment with the Township but did not call her to testify. He rhetorically posed, "Why didn't they?" Then, replied, "Because it would have destroyed their case, because there is no case here." Counsel explained, "When [defendant] drafted a letter to come from somebody else at the township, she didn't sign it, she didn't send it directly to its intended recipient, she sent it to the formal East St Louis Township e-mail channels." He analogized this case to a situation where a grade school kid forges his parent's signature on a report card.

14

¶ 53 Counsel also asserted that the State was confused about the hierarchy involved. He explained that the senior services department for the Clyde C. Jordan entity had its own approval process for employees, of which the Township's board was not apprised. He noted the State did not present anyone from Clyde C. Jordan Senior Citizens Center to testify. Counsel also noted that Mendola acknowledged it was weird that the FBI had interest in a one-page letter in an apartment application file, and the State did not have a good track record with forgery as its own witness—Stokes—testified that the State wrongfully accused her of forgery.

¶ 54 In its reply, the State argued it would be ridiculous to expect Lacy to testify that she used a fraudulent letter to benefit from it. It went on to address counsel's argument that there were no misrepresentations, stating:

"Ladies and gentlemen, that letter is full of material misrepresentations. And I cannot blame Mr. Cueto, he wants to distract you. He wants to divert your attention. He's a very good defense attorney. Of course, he doesn't want you to look at that letter. Of course, he doesn't want you to compare it to all of the testimony that you've heard over the past couple of days that shows that nothing in that letter is true. Nothing in that letter is true. And that defendant is the one who drafted it."

¶ 55 The jury found defendant guilty of both counts. Defendant subsequently filed a motion notwithstanding the verdict (725 ILCS 5/115-4 (West 2018)) or in the alternative for a new trial (*id.* §§ 116-1, 116-2). The motion alleged the State failed to prove the charges beyond a reasonable doubt. It specified that, concerning the forgery conviction, the State failed to prove the document was apparently capable of defrauding another as defined by *Waterman v. People*, 67 Ill. 91 (1873), and intent as defined in *People v. Hunter*, 331 Ill. App. 3d 1017 (2002). Regarding the public contractor misconduct conviction, the motion asserted the State failed to prove defendant engaged

15

in an act that she knew was forbidden by law as defined in *People v. Adams*, 64 Ill. App. 3d 547 (1978). The motion also alleged the court erred in overruling defendant's objection to the State's jury instruction Nos. 15 and 16, and the State made prejudicial and inflammatory statements in its closing argument. The court denied the posttrial motion.

¶ 56    The sentencing hearing took place on January 28, 2020. The parties agreed that the forgery count merged into the public contract misconduct count for sentencing purposes, as it was a lesser included offense. The court explained the potential sentences for the public contractor misconduct ranged from 30 months' probation to 5 years' imprisonment, as well as disbarment from state-related public employment for 10 years. After the parties presented their evidence and arguments, the court found incarceration was inappropriate and imposed a sentence of 30 months' probation. Defendant appealed.

¶ 57                                  II. ANALYSIS

¶ 58    On appeal, defendant contends the evidence was insufficient to prove forgery and public contractor misconduct. Defendant also asserts error in providing State's instruction Nos. 15 and 16, the State's closing arguments, and her sentence.

¶ 59    From the outset, we note St. Clair County records show defendant's probation was successfully completed July 28, 2022.[1] *People v. Hamilton-Dean*, No. 16-CF-1525 (Cir. Ct. St. Clair County, Aug. 8, 2022). Accordingly, defendant's excessive sentencing claim is moot.[2] See *People v. McNulty*, 383 Ill. App. 3d 553, 558 (2008) ("A sentencing challenge is moot where defendant has completed serving his sentence."). Nevertheless, we will address each of the

---

[1]We take judicial notice of the circuit court order. See *American Federation of State, County, & Municipal Employees, Council 31 v. Illinois Labor Relations Board*, 2017 IL App (5th) 160046, ¶ 18 ("A court may take judicial notice of documents in the records of other courts or administrative tribunals.").

[2]While defendant remains barred from state-related employment as a result of her convictions, she does not assert error or request relief in this respect.

16

remaining issues in turn. See *In re Christopher K.*, 217 Ill. 2d 348, 359 (2005) ("[C]ompletion of a defendant's sentence renders a challenge to the sentence moot, but not a challenge to the conviction.").

¶ 60                                 A. Sufficiency of the Evidence

¶ 61    Due process requires the State to prove each element of an offense beyond a reasonable doubt. U.S. Const., amends. V, XIV; Ill. Const. 1970, art. I, § 2; *In re Winship*, 397 U.S. 358, 364 (1970). When reviewing the sufficiency of the evidence, it is not our function on review to retry defendant or substitute our judgment for that of the trier of fact. *People v. McLaurin*, 2020 IL 124563, ¶ 22. Rather, we must determine whether any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *People v. Rudd*, 2012 IL App (5th) 100528, ¶ 11. "A criminal conviction will not be set aside on a challenge to the sufficiency of the evidence unless the evidence is so improbable or unsatisfactory that it creates a reasonable doubt of the defendant's guilt." *People v. Jackson*, 2020 IL 124112, ¶ 64.

¶ 62    Under this standard, circumstantial evidence can be sufficient to sustain a conviction. *Id.* Although not conclusive or binding on this court, we give great deference to the trier of fact's determinations regarding the weight afforded to the evidence and witness credibility. *People v. Gray*, 2017 IL 120958, ¶ 35. We also view the evidence and all reasonable inferences thereof in the light most favorable to the State. *People v. Vanhoose*, 2020 IL App (5th) 170247, ¶ 24.

¶ 63    Defendant here was convicted of forgery and public contractor misconduct. An element of the public contractor misconduct is that defendant knowingly performed an act that she knew was forbidden by law to perform. See 720 ILCS 5/33-7(a)(2) (West 2016). In this case, such act was forgery. To prove forgery, the State must show defendant—with the intent to defraud—knowingly

17

made a false document or altered any document to make it false and that document is apparently capable of defrauding another. *Id.* § 17-3(a)(1).

¶ 64    Defendant first contends that the State failed to prove intent to defraud because there was no direct evidence supporting this element and she gained no personal benefit. Defendant acknowledges that intent may be inferred from the circumstances and where defendant delivered the forged document but asserts such inferences do not apply here where there was no evidence that she delivered the letter. We disagree.

¶ 65    Direct evidence of an intent to defraud is rare; as such, intent to defraud is often proven by circumstantial evidence. *People v. Lighthall*, 175 Ill. App. 3d 700, 706 (1988). "[I]f the forged instrument is uttered the intent to defraud is presumed." *People v. Bailey*, 15 Ill. 2d 18, 23-24 (1958).

¶ 66    Contrary to defendant's argument, the evidence sufficiently proved that she delivered the letter. Defendant's e-mail instructing someone who had access to the Township's e-mail to deliver the letter to McDonald, along with the fact that the letter arrived in the McDonald file, indicates defendant delivered the forged document through a third party via e-mail. *People v. Whitmer*, 369 Ill. 317, 320 (1938) ("The use of third parties in causing a forgery to be committed does not relieve the motivating principal of guilt or constitute a separate offense."). While Alexa from McDonald could not state with certainty how the employment verification letter arrived in Lacy's tenant file, her testimony also provided support that the Township e-mailed her the letter where Alexa provided valid reasons why she did not believe it was sent via facsimile or mail. Accordingly, we believe the circumstantial evidence is sufficient to show defendant delivered the letter such that the presumption of an intent to defraud applies here.

18

¶ 67    Other circumstances also provide support that defendant intended to defraud. By the time defendant created the McDonald letter, she had already directly e-mailed a similarly false letter to another rental company in an attempt to qualify Lacy for the opportunity to rent. Accordingly, the circumstances of this case support the element that defendant had an intent to defraud when she created the McDonald letter.

¶ 68    The fact that defendant gained no personal benefit does not change our judgment. Intent to defraud can exist absent a benefit to defendant. See *People v. Lawson*, 2015 IL App (2d) 140604, ¶ 27. The statutory definition of "with intent to defraud" includes "an intent to cause another to assume, create, transfer, alter, or terminate any right, obligation, or power with reference to *any* person or property." (Emphasis added.) 720 ILCS 5/17-0.5 (West 2016). The deliberate creation of a false document intended to secure Lacy a rental contract meets this definition. Accordingly, the lack of personal gain does not render the evidence insufficient to prove intent to defraud.

¶ 69    Defendant further argues—citing *Waterman v. People*, 67 Ill. 91 (1873)—that the McDonald letter was not apparently capable of defrauding where it sought little more than courtesies based on representation of future employment. She contends the letter did not create a benefit, obligation, nor a legally binding agreement that affects the legal rights of the party that receives them or the party that submits them.

¶ 70    The forgery involved in *Waterman* was a letter, addressed to "any railroad superintendent," that averred defendant worked for A. and S. Railroad but was going west to find a more lucrative position. *Waterman v. People*, 67 Ill. 91, 92 (1873). The letter further stated, " 'Any courtesies shown him will be duly appreciated, and reciprocated should opportunity offer' " and was signed "H.A. FONDA, Supt." *Id.* The Illinois Supreme Court found this letter was not the subject of legal fraud. *Id.* at 93. It based its holding on the fact that the letter was a mere introduction and attempt

19

to receive courtesies, and that the indictment failed to specify any extrinsic facts which gave the letter any force or effect beyond what appears on its face or that the letter was in fact given to another party. *Id.* at 92-93.

¶ 71    We find the letters at issue in this case went beyond an attempt to receive courtesies. The letters were addressed to rental companies and falsely stated that Lacy was hired as a full-time employee and would receive an annual salary of $34,000 or $36,000, in an attempt to qualify and begin negotiations to rent a home. We moreover note that defendant here does not challenge the validity of the indictment in this regard. Accordingly, we find *Waterman* distinguishable.

¶ 72    The Illinois Supreme Court decision in *People v. Hagan*, 145 Ill. 2d 287, 305-06 (1991), is controlling. In negotiating a possible lease for his business, the defendant faxed a letter to a commercial and corporate real estate firm indicating that his average monthly bank account balances were roughly $520,000 in one bank account and $77,000 in another account, for the most recent year. *Id.* at 292. The letter was dated January 27, 1989, on First Midwest Bank of Mundelein letterhead, addressed to defendant, and signed by Laura M. Jones, a personal banker. *Id.* Laura Jones, however, testified that she did not prepare the letter and defendant's bank accounts collectively had a negative balance. *Id.* at 292-93. On appeal, defendant asserted, *inter alia*, the allegedly forged document did not have the capability to defraud. *Id.* at 305.

¶ 73    In determining whether the letter had the capability to defraud, the Illinois Supreme Court considered whether a reasonable person might be deceived into accepting the document as genuine. See *id.* at 306-07. The court answered in the affirmative, reasoning that the letter was on letterhead and contained a banker's signature. *Id.* at 306. Additionally, the letter provided relevant information as to defendant's finances such as account numbers, dates, and account balances. *Id.* The court further found the letter was capable of altering the obligations of defendant and the real

20

estate firm as the firm "might rely on the false information, not knowing it was false, to continue negotiations with defendant and perhaps also execute a lease agreement with defendant." *Id.*

¶ 74 Similarly, here, both letters were on Township letterhead. While there was no signature on the McDonald letter, the letter contained a signature block for the Township's program director, Yvette Johnson. Importantly, the evidence indicated that someone at the Township e-mailed the letter to McDonald at defendant's direction. Accordingly, we find that a reasonable person could have believed, based on the letter, that Lacy would have full-time employment that met the income requirements to rent with McDonald, when in fact Lacy was not hired as a full-time employee that would make $34,000 per year. McDonald relied on this information to approve Lacy's rental application and execute a rental contract with Lacy. Accordingly, under *Hagan*, we find the evidence was sufficient to prove the letter was apparently capable of defrauding McDonald.

¶ 75 With regard to only the public contractor misconduct conviction, defendant lastly argues—citing *People v. Adams*, 64 Ill. App. 3d 547 (1978)—that the indictment failed to specify that she knew her actions were forbidden by law and the State failed to prove that she engaged in an act that she knew was forbidden by law. We again disagree.

¶ 76 In *Adams*, the indictment charged that the defendant, " 'while acting in his official capacity as highway lead worker, did knowingly perform an act which he knew was forbidden by law to perform in that he ordered [a subordinate state employee] to cut down a tree on private property with tools owned by the State of Illinois ***.' " *Id.* at 548. The *Adams* court found the indictment insufficiently pled official misconduct where it "not only failed to mention that defendant had knowledge of any violation of a rule or regulation, it failed to state whether any rules or regulations ever existed." *Id.* at 550. The court further reasoned, "In situations such as the one here, where it is not clear that a criminal act was committed, the indictment must specifically allege all elements

21

of the crime." *Id.* It concluded, "Absent any allegation in the indictment that defendant had knowledge of the rules and regulations of the State, an essential element of section 33-3(b) is lacking." *Id.* "In cases of questionable criminal conduct under subsection (b) of the official misconduct statute, the indictment must, at the very minimum, contain allegations of a violation of another statute or a rule or regulation of the State." *Id.*

¶ 77 Unlike *Adams*, the indictment here explicitly provided the criminal statute that defendant knowingly violated. Accordingly, we find *Adams* distinguishable.

¶ 78 Furthermore, we find defendant's argument that the State failed to prove she knew her actions were forbidden by law is forfeited where her brief presented such argument in one sentence with no legal citations. *People v. Borowski*, 2015 IL App (2d) 141081, ¶ 6; see Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020). Elsewhere in her brief, defendant asserts that she simply misunderstood that she did not have the authority to hire Lacy. Defense counsel made such argument at trial. However, the jury was not required to accept defendant's theory of the case, especially when there was no evidence of defendant's ability to hire Township employees at trial. See *People v. Heflin*, 71 Ill. 2d 525, 533-34 (1978) ("the jury was not compelled to accept the defendant's account of what happened at the time of the crime, but was permitted to consider the surrounding circumstances and the probability or improbability of the defendant's story"). In contrast, the State presented the testimonies of Yvette and Stokes, both of which indicated defendant did not have the authority to hire Lacy as a full-time employee and, in fact, did not actually hire Lacy. The jury was therefore free to accept the State's theory. See *People v. Warren*, 33 Ill. 2d 168, 174 (1965) ("Clearly, where defendant's statement is contradicted by the facts and circumstantial evidence, as here, a jury need not believe it, even though it is not directly contradicted by other witnesses."). Because it is the function of the jury to weigh the evidence and

determine all factual matters, we defer to its judgment (see *People v. Moss*, 205 Ill. 2d 139, 164-65 (2001)) and find the evidence was sufficient to show defendant knew her actions were forbidden by law.

¶ 79                                       B. Jury Instructions

¶ 80    Defendant next argues that the court erred in providing the State's jury instruction Nos. 15 and 16, which were nonpattern jury instructions regarding the public contractor misconduct charge based on the pattern jury instruction for public official misconduct. The State contends the jury instructions correctly stated the law. It further argues that the public official misconduct statute and public contractor misconduct statute are substantially similar such that modifying the IPI instruction for public official misconduct was appropriate.

¶ 81    Jury instructions serve the important purpose of "convey[ing] the legal rules applicable to the evidence presented at trial and thus guide the jury's deliberations toward a proper verdict." *People v. Mohr*, 228 Ill. 2d 53, 65 (2008). When no IPI instruction on the matter at hand exists, the court may provide a nonpattern instruction for that matter, provided it is "simple, brief, impartial, and free from argument." Ill. S. Ct. R. 451(a) (eff. Apr. 8, 2013).

¶ 82    The trial court's decision to provide an instruction is reviewed for an abuse of discretion. *People v. Choate*, 2018 IL App (5th) 150087, ¶ 23. Under that standard, we must determine whether the instructions, taken as a whole, "fully and fairly announce the law applicable to the theories of the State and the defense." *Mohr*, 228 Ill. 2d at 65. A trial court abuses its discretion if the instructions fail to accurately state the law or where the instructions "relieve the State of its burden of proving any element of the charge beyond a reasonable doubt." *Choate*, 2018 IL App (5th) 150087, ¶ 23.

23

¶ 83     It is undisputed that no IPI instruction explicitly addressing public contractor misconduct exists. The State's instruction Nos. 15 and 16 provided that defendant was guilty of public contractor misconduct if defendant was a public contractor who knowingly performed an act which she knew she was forbidden by law to perform when in her official capacity. The statute provides a person is guilty of public contractor misconduct when such person is a public contractor who "knowingly performs an act that he or she knows he or she is forbidden by law to perform" while "in the performance of, or in connection with, a contract with the State, a unit of local government, or a school district or in obtaining or seeking to obtain such a contract." 720 ILCS 5/33-7(a)(2) (West 2016). Comparing the modified instructions with the statutory elements of the public misconduct statute, we find the instruction substantially tracks the language of the statute and accurately states the law.

¶ 84     We also agree with the State that a comparison of the public official misconduct statute to the public contractor misconduct statute supports finding the modified instructions accurately state the law. The public official misconduct statute prohibits a "public officer or employee or special government agent" from "[k]nowingly perform[ing] an act which he [or she] knows he [or she] is forbidden by law to perform" when in his or her "official capacity." *Id.* § 33-3(a)(2). While this statute concerns a different type of public employment than the public contractor misconduct statute, both statutes prohibit the same act, *i.e.*, "knowingly performs an act which he or she knows he or she is forbidden by law to perform" while in connection with his or her public employment. *Id.*; 720 ILCS 5/33-7(a)(2) (West 2016).

¶ 85     Here, the State's instruction Nos. 15 and 16 were based on IPI 21.15 and 21.16, both of which follow the language of the public official misconduct statute. IPI 21.15 has been held to accurately state the law. See *People v. Rosario*, 2021 IL App (4th) 190794-U, ¶ 34. Accordingly,

because the only meaningful difference between the two relevant sections of the statutes is the type of public employment, the modified IPI instructions—which only replaced "public official" with the applicable public employment here—still accurately states the law with respect to the element at issue here.

¶ 86    We further decline to reverse based on defendant's argument that the instructions distracted the jury from determining whether she knowingly performed an act which she knew was forbidden by law to perform based on the crime for which she was being charged—forgery—because the State's instruction No. 15 created an open-ended implication of other criminal issues as a basis to find defendant guilty. We first note that defendant fails to cite what evidence at trial the jury could have relied on to find defendant performed an act—other than forgery—that she knew was forbidden by law.

¶ 87    Nevertheless, assuming, *arguendo*, that the instruction was misleading or confusing, we fail to see how such instruction harmed defendant. "An error in a jury instruction is harmless if it is demonstrated that the result of the trial would not have been different if the proper instruction had been given." *People v. Johnson*, 146 Ill. 2d 109, 137 (1991). The jury determined defendant was guilty of forgery. Consequently, any notion that the jury would not have found defendant guilty of public contractor misconduct had the nonpattern instruction stated that she "performed the act of forgery" rather than "performed an act she knows she is forbidden by law to perform" is meritless.

¶ 88                    C. The State's Closing Argument

¶ 89    Defendant next complains of two of the State's comments during closing argument. She contends that two comments were misrepresentations that invoked the passions of the jury and

25

prejudiced defendant. Defendant, however, failed to preserve this issue or request plain-error review.

¶ 90     To preserve an error for review, the party must object at trial and present the issue in a posttrial motion. *People v. Nelson*, 235 Ill. 2d 386, 436 (2009). Defendant failed to object to the statements during trial and only asserted a general allegation that the State made prejudicial statements during closing arguments in her posttrial motion. Accordingly, defendant forfeited such issue. *People v. Salamon*, 2022 IL 125722, ¶ 56 (defendant forfeits arguing an error on appeal when the issue was not properly preserved by raising it at trial and in a posttrial motion); *People v. Johnson*, 250 Ill. App. 3d 887, 893 (1993) ("Broad and general allegations in a post-trial motion are inadequate to advise the court of the challenge being raised, and are inadequate to preserve an issue for appellate review.").

¶ 91     A court may excuse a party's forfeiture of an issue under plain-error review if the evidence was closely balanced or the error was of such magnitude to deny defendant a fair and impartial trial. *People v. Nieves*, 192 Ill. 2d 487, 502 (2000); see Ill. S. Ct. R. 615 (eff. Jan. 1, 1967). However, defendant has not requested plain-error review nor made a plain-error argument on appeal. Accordingly, we decline to excuse defendant's forfeiture. *Nelson*, 235 Ill. 2d at 437 (defendant's failure to make a plain-error argument results in forfeiture of plain-error review).

¶ 92                                    III. CONCLUSION

¶ 93     For the foregoing reasons, we find the evidence supported defendant's convictions and no other error warrants reversal. Accordingly, we affirm defendant's conviction and sentence.


¶ 94     Affirmed.